38



**PAID**
FL001835

# United States District Court

## Eastern District of Michigan
## Southern Division

---

**United States**

and

**Bradley Geller**

           **Plaintiffs,**

**v.**

**State of Michigan**

           **Defendant.**

Case: 2:17-cv-13233
Judge: Lawson, David M.
MJ: Grand, David R.
Filed: 10-03-2017
QUI TAM USA, et al v. SCHUETTE, et al (dw)

---

Jefferson B. Sessions III
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, D.C.   20530
(202) 514-2000
        Attorney for the Plaintiff, United States

Bradley Geller  (P -31441)
601 Huronview Boulevard
Ann Arbor, Michigan 48103
(734) 665-2330
        Attorney for the Plaintiff, Bradley Geller

William D. Schuette
Michigan Attorney General
G. Mennen Williams Building
Lansing, MI  48909
(517) 373-1110
        Attorney for the Defendant, State of Michigan

# I. <u>Statement of the case</u>

This is an action for injunctive relief concerning adults in Michigan who have a guardian or who may become subject to guardianship.

The guardianship system in practice is neither adversarial nor investigative; it is best described as presumptive.  A probate judge encapsulated this reality: "Of course a person for whom a guardianship petition is brought needs a guardian.  Why else would someone file a petition!"

The guardianship system as practiced veers substantially from statutory mandates.   Leitmotifs of the system include paternalism and perverse financial incentives, both of which contribute to the unnecessary diminution of individuals' liberty and property interests.

Actions or inactions of Defendants violate federal and state and Constitutional rights to due process; least restrictive alternative; freedom of speech, association and religion; and other rights under the Americans with Disabilities Act of 1990, as amended, 42 USC sec. 12101 *et seq.*, and the federal Nursing Home Reform Act of 1989, as amended, 42 USC 1395i-3; 42 USC sec.1396r.

This is a *Qui Tam* action for damages under the federal False Claims Act for Medicaid fraud, and for injunctive relief under that statute.  31 USC sec. 3729 *et seq.*

This is an action under the Michigan Medicaid False Claims Act, MCL 400.601 *et seq.*

This is an action under the Racketeer Influenced and Corrupt Organizations Act, 18 USC sec.1961 *et seq.*

This is writ of *Habeas Corpus* for each institutionalized individual in Michigan who has a guardian; who is being held against her or his will; and who could live in the community with adequate supportive services.

# II. <u>Background</u>

## A. <u>Guardianship</u>

'It is as cruel and unlawful to interfere with the liberty of the old as of anyone else; and the law cannot favor or permit this liberty to be diminished." <u>In the Matter of Application to Appoint a Guardian for Mary Storick</u>, 64 Mich 685 (1887).

Any person interested in the welfare of an individual can file a petition requesting the probate court appoint a guardian. MCL 700.5303(1).

Upon petition, notice, hearing and appropriate findings of fact, a probate court can appoint a guardian for an adult.

An action must be brought under the Michigan Mental Health Code for individuals who have a developmental disability, MCL 330.1604(2); <u>In re Neal</u>, 230 Mich App 723 (1999).

For all other individuals, including those with an alleged mental illness, an action must be brought under the Michigan Estates and Protected Individuals Code (EPIC), MCL 700.5301 *et seq.*

The Mental Health Code also sets forth the authority of any guardian concerning inpatient psychiatric care, MCL 330.1415, and electro-convulsive treatment (ECT). MCL 3309.1717.

The Michigan Do-Not-Procedure Act provides a guardian with authority can sign a Do-Not-Resuscitate Order (DNR) applicable in all non-hospital settings. MCL 333.1051 *et seq.*

An individual under full or plenary guardianship loses the right to decide upon medical treatment; to choose where live; to handle her or his property, income and financial affairs; and other rights.

Guardianship is universally recognized as the most intrusive method of surrogate decision-making for medical care, and thus should be used only as a last resort. For an authoritative, legal guide to guardianship and alternatives, see Geller B., Changes and Choices: Surrogate Decision-Making for Health Care in Michigan (2014). http://upcap.org/admin/wp-content/uploads/2016/06/ChgsChoicesSurrogateDec-2014.pdf

## B. Incidence of Guardianship

There are 60,777 adults in Michigan who have a guardian, 33,478 of which were established under EPIC. 2016 Annual Report of the Michigan State Court Administrative Office.

In 2016, there were 11,763 petitions to appoint a guardian, 8,763 of which were brought under EPIC. *Ibid.*

Scant data that exist nationally suggest Michigan is an outlier compared with other states in the number of adults who have a guardian.

4

The incidence of guardianship differs significantly from county to county. For example, Wayne County has 15.7% of Michigan adult population age 65 or older, but 29.9% of adult guardianships under EPIC. United States Census Bureau; 2016 Annual Report of the Michigan State Court Administrative Office.

There has never been a study in Michigan comparing the incidence of guardianship based on demographic factors such as place of residence of the respondent (rural, suburban or urban); type of residence (one's own home, adult foster care home, home for the aged, "assisted living" or nursing home); wealth of the respondent; sex of the respondent; and race of the respondent.

There are no data reflecting the extent guardianship is imposed with the primary purpose of moving an individual to a nursing home or other congregate setting.

No one knows (or can venture a guess) how many nursing home residents in Michigan have a guardian.

## C. The Michigan Supreme Court Task Force on Guardianships and Conservatorships, and the Guardianship Ombudsman Program

Guardian, Inc. of Wayne County was appointed guardian for over 600 individuals. A receiver, John Chase Jr., categorized the egregious financial wrongdoings of the guardian as a combination of nonfeasance, misfeasance and malfeasance. (The principals of Guardian, Inc. would subsequently be convicted and sentenced to a federal penitentiary.)

Conceived by the Elder Law and Disability Rights Section of the Michigan State Bar, and supported by a unanimous vote of the State Bar Representative

5

Assembly, the Michigan Supreme Court in 1997 convened a task force to explore significant issues in the guardianship system.

A review of the task force's 11 unanimous recommendations reveals how little has been accomplished over the past 20 years. <u>Final Report of the Supreme Court Task Force on Guardianships and Conservatorships</u> (1998). http://courts.mi.gov/Administration/SCAO/Resources/Documents/Publications/Reports/gdntaskrpt.pdf

As one response to the Task Force Report, the Chief Justice (herself a former probate judge) appointed a Michigan Court of Appeals judge as Guardian Ombudsman. The appointee had previously served as one of the most respected probate judges in the state.

The subsequent Chief Justice quickly dismantled the program. The ostensible reason was the caseload of the Court of Appeals. The motivation was personal pique of the Chief Justice toward her predecessor, denying her credit for the noted innovation.

Reported cases of major embezzlement, financial wrongdoing or excessive fees by professional fiduciaries did not stop with Guardian Inc. of Wayne County. Cases have occurred in the following counties:

Wayne  (Detroit *Free Press*, June 28, 2000)

Van Buren  (Kalamazoo *Gazette*, February 26, 2001)

Macomb  (Detroit *News*, February 27, 2004)

Eaton  (Lansing *State Journal*, November 29, 2006)

Genesee   (Flint *Journal*, December 17, 2006)

Macomb  (Macomb *Daily*, August 30, 2008)

6

Arenac  (Bay City *Times*, October 9, 2009)

Oakland County  (WXYZ- 7, May 1, 2017)

Macomb County  (WXYZ-7, May 2, 2017, May 25, 2017)

There have also been reports of family guardians or conservators embezzling large sums.


## D. **Professional Guardians**


"We license barbers in this state, but we don't license people who have life-and-death control over someone else.   We don't do criminal background checks, don't require training education, minimal staffing requirements.   Nothing.  Zero."  (Advocate quoted in series by Wendy Wendland-Bowyer, Detroit Free Press, May 24-26, 2000.


To this day, professional guardians are not licensed or otherwise regulated by the Michigan Supreme Court, the Michigan Department of Licensing and Regulatory Affairs, or any other governmental entity.

There are about 300 professional guardians in Michigan. List compiled by Bradley Geller largely through contacting probate court registers and administrators throughout the state.

A number of professional guardians are responsible for more than 100 individuals; two professional guardians exceeded 600 individuals. No one can venture a ballpark estimate of the number of individuals for whom professional guardians collectively serve.

### E. Public Administrators

The Michigan Attorney General appoints public administrators. The Attorney General does not pay public administrators but shares responsibility for their conduct.

For many years, these individuals were designated by probate courts to process escheats. This practice was a quite lucrative sinecure. About 15 years ago, the Attorney General took over this process.

Today, public administrators can be appointed as guardian, as conservator and as personal representative of decedent estates.

There is no limit to the number of individuals for whom a public administrator can be appointed as a guardian or conservator or personal representative. There are no data revealing the number of times each public administrator has been appointed or the amount of compensation each public administrator has received.

The number of public administrators in a county is not primarily dependant on the county's population. Kent County, with a 2015 population of 636,369 has one public administrator. Oakland County, with a population of 1,242.000, has 17 public administrators; Wayne County, with a population of 1,759,000 has 15 public administrators. United States census data; State of Michigan website.

The system is a quintessential "old boys" network. Thirty-four of the 43 public administrators in the tri-county metropolitan area are men. Of the 9 who are women, 8 were appointed in 2013 or later.

8

**F. Medicaid**

Prior to 1965, the federal government's role in funding long term care was minimal. Passage of Title XIX of the Social Security Act sparked exponential growth in the nursing home industry.

Title XIX of the Social Security Act, 42 USC sec. 42 USC 1396 *et seq.*, commonly known as Medicaid, is a program jointly funded by the federal and state government to pay for medical care and certain non-medical services for individuals who financially qualify. The program is administered by the Michigan Department of Health and Human Services.

For fiscal year 2018, the Michigan Medicaid budget for nursing home care is $1,794,419,600.00. PA 2017, No.107, Article X, Part 1, section 122.

The Medicaid budget for community-based services is $348,087,400.00. *Ibid.*

For fiscal year 2018, for individuals enrolled in Medicaid and under guardianship, Medicaid pays up to $95.00 per month in guardianship fees. PA 2017, No. 107, Article X, Part 2, section 16.

An explanation of the complicated financial eligibility criteria for Medicaid, written for the public, is available. Geller B. Medicaid and Long Term Care. https://www.michigan.gov/documents/miseniors/MedicaidLTC_274718_7.pdf

## G.  **Nursing Homes**

Fifty years ago, Erving Goffman, a renowned sociologist, classified nursing homes as one type of "total institution."  He notes an individual comes into the total institution ...

> ... with a conception of himself made possible by certain stable social arrangements in his home world.  Upon entrance, he is immediately stripped of the support provided by these arrangements. ... [H]e begins a series of abasements, degradations, humiliations, and profanities of self.  His  self  is systematically, if often unintentionally, mortified.

Goffman, Erving. Asylums: Essays on the Social Situation of Mental Patients and Other Inmates.  Doubleday & Company, Inc. (1961) p. 14.

There are currently approximately 43,000 individuals in Michigan who are in a nursing home, some for short-term rehabilitation, most for long-term care.

The State of Michigan currently licenses 460 nursing homes in Michigan.  Of those homes, 446 homes participate in Medicaid, Medicare or both. On-line data provided by the Bureau of Community and Health Systems, Michigan Department of Regulatory Affairs; correspondence, Bureau of Health and Community Systems.

Among nursing homes, 35 are public county medical care facilities. Michigan County Medical Care Facilities Council.

10

In 1962, Michigan became one of the first states to begin de-institutionalizing individuals from state psychiatric hospitals. At the time there were 30,000 patients, 9,000 of whom were older adults.

With reforms in the mental health system, older individuals with serious mental illness today would ideally spend a short period in a psychiatric facility, with daily therapy and psychotropic medication prescribed and monitored by a psychiatrist. Instead, many are in nursing homes long-term, in locked units, with perhaps once-a-month counseling and psychotropic medication prescribed (correctly or not) by an internist.

These "back-door commitments" occur without the benefit of the due process protections in a civil commitment hearing, during which the individual always has counsel, a psychiatrist must testify and the court must find the respondent exhibits certain behaviors specified in statute.

## H. <u>Michigan Long Term Care Ombudsman Program</u>

Upon press reports in the late 1960's about poor care in the nation's nursing homes, the federal government initiated a pilot program in 1972, funding a "nursing home ombudsman" in Michigan and five other states. The role of the ombudsman was to work toward improving the quality of care and quality of life of residents of nursing homes.

The program was later expanded to all states and in 1981 renamed the Long Term Care Ombudsman Program. The Michigan Long Term Care Ombudsman Program today is supported by both federal and state funds.

There are approximately 100,000 adults in Michigan who reside in licensed long term care facilities: nursing homes, homes for the aged or adult foster care homes.

Twenty-one local ombudsmen visit facilities and work with residents and families to address complaints about quality of care and quality of life.

The program receives between 2,000 and 3,500 complaints per year. The program also advocates with state and federal regulatory agencies, the legislature and the industry for systemic change.

# III. Parties

## A. Plaintiffs

### 1. United States

An action brought by an individual under the federal False Claims Act must be brought in the name of the United States. 31 USC sec. 3730(b)(1). The United States has authority to intervene in this case within 60 days of its filing. 31 USC sec. 3730(b)(3).

This court can allow the Attorney General to intervene in a private suit under the Americans with Disabilities Act. 42 USC sec. 2000a-3(a)

The Unites States can participate in a civil proceeding for violations of the Racketeer Influenced and Corrupt Organizations Act. (RICO). 18 USC sec. 1964(b). The underlying crimes for a RICO action include, *inter alia*, bribery, extortion, wire fraud and kickbacks.

The Anti-Kickback Statute, 42 USC sec. 1320a-7b, *et seq.*, prohibits the offering or receipt of kickbacks for referrals to federal health care funded programs. Kickbacks can also be illegal under the Michigan Medicaid False Claims Act, MCL 400.604, and the Michigan Health Care False Claims Act, MCL 752.1104, *et seq.*

The United States has authority to investigate and address practices in Michigan's 35 county medical facilities pursuant to the Civil Rights of Institutionalized Persons Act, 42 USC sec. 1997, *et seq.*

## 2. Bradley Geller

During his practice as a lawyer, Bradley Geller's clients have been adversely affected by practices set forth in this Complaint. For many misdeeds, there has been no effective remedy.

Bradley Geller has had extensive experience with Michigan guardianship law and practice, with professional guardians and with nursing home residents. He worked for more than 10 years as counsel for the Washtenaw County Probate Court, responsible for its guardianship program.

He is in a unique position to identify activities that violate the Constitution, the Americans with Disabilities Act, the False Claims Act and other relevant statutes and regulations.

Having drafted the Michigan Guardianship Reform Act, PA 1988, No. 398, together with consequent changes in court rules, court forms and civil jury instructions, he is specially aggrieved at the failure of legislative reforms to be implemented by the courts.

As a lawyer, he is an "officer of the court" with its attendant responsibilities.

As an older Michigan resident, he is subject to being a respondent in a guardian proceeding.

Bradley Geller will donate all damages, penalties, awards and attorney fees to non-profit organizations, including programs providing free legal services to older or disabled adults

## B.  Defendant

### State of Michigan

The State of Michigan is a political subdivision of the United States. The Michigan Constitution of 1963 establishes the Michigan Supreme Court as the highest court in the state and head of the judicial branch of state government.

Under the Constitution's concept of "one court of justice," the Michigan Supreme Court has superintending control over all lower courts in the state, including 78 probate courts.  Michigan Constitution of 1963, Article VI, sec. 4.

The State of Michigan's power to impose guardianship is based on the principle of *parens patriae*.  As such, guardians appointed by a court are agents of the state.

The State of Michigan, through the office of the State Attorney General, appoints all county public administrators, and has authority to investigate Medicaid fraud.

The State of Michigan licenses nursing homes, MCL 333.20142, and employs licensing officers and surveyors to oversee nursing homes' compliance with federal and state law, regulations and directives. MCLA 333.20155. See also, *State Operations Manual Appendix PP, Interpretive Guidelines for Long Term Care Facilities*, Center for Medicare and Medicare Services, United States Department of Health and Human Services.

The Michigan legislature sets the Medicaid budget, including the division of long-term care dollars into institutional and community-based care.

The Michigan Attorney can initiate proceedings under the Michigan Health Care False Claim Act, MCL 752.1001 *et seq.* One violation of that Act is kickbacks made by health care providers.

# IV. **Jurisdiction**

This court has jurisdiction for claims in this Complaint under the following federal statutes:

False Claims Act, 31 USC sec. 3729 *et seq.*, 31 USC sec, 3730(b)(1).

Section 1983 for violation of due process and civil rights, 42 USC sec. 1983.

Americans with Disabilities Act, 42 USC sec. 12188(a)(1);
42 USC sec. 2000a-3

Racketeer Influenced and Corrupt Organizations Act, 18 USC sec. 1961 *et seq.*,
18 USC sec. 1964(c).

This court has pendant jurisdiction for claims under the Michigan Medicaid False Claims Act, MCL 400.601 *et seq.*; MCL 400.610a(1).

# V.  **Statement of Facts**

The facts in this Complaint are organized into five sections:

A.  Probate Court Procedures

B.  The Nexus Between Probate Courts and Professional Guardians

C.  Guardians

D.  The Nexus Between Professional Guardians and Nursing Homes

E.  Nursing Homes

## A.  **Probate Court Procedures**

1.  "I know what you are going to talk about, counsel.  You are going to talk about constitutional rights.  They are not important here."   (Probate Court Judge during guardianship hearing.) (Except as otherwise noted, all statements in quotation marks were made in my presence.)

2.  There are more than 100 ways the 78 probate courts differ in adult guardianship practices and procedures.

Geller, B., In Plain Sight: Variance in Practice in Michigan Probate Courts. region7aaa.org/wordpress/assets/Variance-among-probate-courts.pdf

3. In a guardianship proceeding, a probate judge's "powers are purely statutory and the requirements of the statute must be strictly observed." Stevens v. Stevens, 226 Mich. 446, 449; 254 N.W. 162 (1934).

4. A prominent elder law attorney obtains guardianships without notice and a hearing "all the time."

5. Personal notice to the respondent prior to a hearing is required for all guardianship hearings, even in an emergency. MCL 700.5311(1)(a); MCL 700.5312(1).

6. A hearing is required before appointment of a guardian, even in an emergency. MCL 5303(3); MCL 700.5312(1).

7. "If the individual wishes to be present at the hearing, all practical steps shall be taken to ensure his or her presence, including, if necessary, moving the hearing site." MCL 700.5304(5).

8. "In my years on the bench, I have never moved the site of a [guardianship] hearing." (Probate Court Judge)

9. Many respondents in guardianship proceedings do not attend the hearing.

10. There are a number of reasons for respondents not attending the hearing, including not being aware of their right to attend, fear of rocking the boat, physical disability and lack of transportation.

11. "Judges do not want people [respondents] being brought kicking and screaming to the hearing. The reason they do not come is that they don't care." (Probate Court Judge after surveying all the state's probate judges.)

12. A judge, *sua sponte*, closes a hearing, though that right belongs only to respondent. MCL 700.5304(6)

13. A judge prohibits a respondent from speaking at the guardianship hearing.

14. A physician's letter is introduced as evidence with no opportunity for respondent to cross-examine the physician.

15. A physician's letter doesn't connect the diagnosis with the inability to make informed decisions, e.g., "Mr. Colbert has arteriosclerosis. He needs a guardian." (The entirety of an actual physician's report.)

16. In one county, over a period of 10 years, a physician or mental health professional testified in an adult guardianship hearing under EPIC once.

17. In that case, the respondent had an estate valued at $2,000,000.00.

18. "The individual is entitled to ... present evidence [and] to cross-examine witnesses .... " MCL 700.5304(5).

19. A court does not provide any equipment to enable a respondent with hearing deficits to hear any of the proceedings.

20. A respondent has the right "to see and hear all evidence bearing on the individual's condition." MCL 700.5304(4).

21. Some guardianship hearings last 2 minutes.

22. Statute requires the court to determine **both** "incapacity" and "necessity" by clear and convincing evidence "with each finding supported separately on the record." MCL 700.5306(1).

23. Instead of making individualized findings of incapacity and necessity, courts almost uniformly use checkboxes on a court form with conclusory statements. PC 631, Order Regarding Appointment of Guardian for Incapacitated Individual.

24. Louis Sullivan coined the phrase that became the mantra of modern architecture: "Form follows function." In the guardianship system, function follows forms.

25. "Incapacitated individual " is defined as

> ... an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions. MCL 700.1105

26. A judge appoints a guardian without clear and convincing evidence the individual is an "incapacitated individual." MCL 700.5306(1).

27. A judge appoints a full guardian for an individual recently tested with an IQ of 135, with the allegations she crosses the street dangerously (to go to the bank and shopping) and her housekeeping skills have deteriorated.

28.  The guardian, her daughter, put Mom in a nursing home despite Mom not needing nursing home care; daughter would not consider assisted living because the house would need to be sold and her descendents would "lose" their inheritance.

29.  A judge appoints a guardian based on physical disability alone.

30.  A judge uses the wrong standard in determining incapacity, appointing a guardian because in the court's view, the individual is not making responsible decisions.

31.  The definition of incapacity as an inability to make "responsible decisions" was changed in Michigan statute in 1988.  In materials written for the public, a court still uses that phrase today to describe the basis for guardianship.

32.  A judge appoints a full guardian for a retired professor who trips, breaks her leg, and goes to the hospital.  After treatment she wishes to return home.  The individual has an estate exceeding $1,000,000 and a long-time friend in the home to serve as caretaker.  The guardian refuses to honor her wishes, believing she is safer in a nursing home.

33.  "If individuals petition the court for a guardian, pay the filing fee, wait several weeks for the hearing and come to the hearing expecting me to appoint them as guardian, I am not going to disappoint them, if I see no harm in appointing a guardian." (Probate Court Judge.)

34.  An adult of sound mind can voluntarily sign a durable power of attorney for health care authorizing a "patient advocate" to make medical care and personal care decisions if the individual becomes unable to participate in medical care decisions.   MCL 700.5506 *et seq.*

116. Nursing homes abide by a guardian's wishes restricting visits and visitors despite the individual having the right to visitors of his or her choice, as provided in state and federal law.

117. Despite the federal right of a resident to choose health care providers, a nursing home will not let a resident choose a hospice organization, or relies on the decisions of the nursing home physician instead of the resident's personal physician.

118. Nursing homes do not ask each resident if she or he wishes to move from the nursing home, as the nursing home is required to do.

119. Nursing homes are cited for violations of the Surveyor's Guidelines (which operationalize federal statutes and regulations) concerning the quality of care and quality of life of residents.

120. Some citations reflect "immediate jeopardy" of residents.

121. A nursing home does not permit a resident to take a walk outside in springtime.

122. Despite an individual without a guardian having the right to leave the nursing home permanently, a nursing home prevents the individual from leaving.

# V. <u>Claims</u>

## A.  <u>Examples of practices that constitute Medicaid fraud under federal or state law</u>

A1.   Guardians charging Medicaid-paid fees but not adequately performing their statutory duties, including visiting, authorizing needed medical care, obtaining services, taking proper care of money and personal property.

A2.   Guardians charging Medicaid-paid fees but violating the rights of individuals guaranteed by the United States Constitution and federal law.

A3.   Guardians institutionalizing individuals (or keeping individuals institutionalized) whose care is paid, in whole or in part, by Medicare or Medicaid, when there are less restrictive alternatives available.

A4.   Guardians interfering with the process for individuals who wish to leave the nursing home and return to the community, when care in the community costs fewer Medicaid dollars.

A5.   Guardians receiving a kickback for referring an individual to a particular nursing home.

A6.   Hospital personnel petitioning for guardianship, nominating a particular person as guardian, and receiving a kickback from the guardian.

A7. Nursing homes petitioning for guardianship, nominating a particular person as guardian, and receiving assurance the guardian will keep the individual in that nursing home.

A8. Nursing homes receiving kickbacks from other health care providers for exclusive contracts.

A9. Nursing homes billing Medicare or Medicaid for services but violating the rights of residents, including the right to receive quality care.

A10. Nursing homes interfering with the process for individuals who wish to leave the nursing home and return to the community, when care in the community costs fewer Medicaid dollars.

A11. Courts imposing guardianship when an individual is not incapacitated or guardianship is not necessary, and guardian fees are paid through Medicaid.

A12. Courts conspiring to appoint a professional guardian whose fees are paid through Medicaid, when there is a family member willing and suitable to serve.


**B.   Examples of practices that violate the Americans with Disabilities Act**

B1. Courts failing to accommodate individuals with sensory or mobility deficits.

B2. Courts imposing guardianship when an individual is not incapacitated or guardianship is not necessary.

B3.   Courts imposing guardianship upon an individual with physical disabilities but without cognitive decline.

B4.   Courts failing to appoint a limited guardian rather than a full guardian, when a limited guardian meets the individual's demonstrated needs.

B5.   Guardians unnecessarily institutionalizing individuals.

B6.   Guardians "placing" individuals in locked units without cause, or authorizing psychotropic medication when the medication or dosage is contraindicated.

B7.   Guardians and nursing homes interfering with the process for individuals who wish to leave the nursing home and return to the community.

## C.   **Examples of practices that constitute a denial of due process of law or other rights**

C1.   A court imposing guardianship without notice and a hearing; without effective counsel; without the ability of the respondent to present evidence and to cross-examine witnesses; without proof of incapacity _and_ necessity; without written findings of fact.

C2.   A court imposing guardianship without legal justification, violating the standards set forth in statute.

C3.   A court imposing full guardianship when a limited guardian would meet the demonstrated needs of the individual.

C4.   A court not enforcing the statutory requirement of guardians to file an annual account to the court concerning assets, income and expenditures within the guardian's control.

C5. A court not providing training to guardians *ad litem*, appointed counsel and guardians, with abject disregard that the lack of training will lead to wrong decisions.

C6.   A guardian denying an individual her or his First Amendment rights to practice her or his religion and to enjoy freedom of association.


**D.   Examples of practices that violate the Racketeer and Corrupt Organizations Act, with underlying crimes of, inter alia, extortion, bribery, embezzlement, wire fraud, mail fraud and illegal kickbacks.**

D1.   The "pay for play" system care whereby the *quid pro quo* for court appointments and approval of fees are campaign contributions, campaign fund raising, an increased court budget, or the receipt of good or services.

D2.   The practice of favoring the appointment of professional guardians over family members.

D3.   The public administrator system, including favoritism, inordinate fees, and embezzlement as court appointed fiduciaries.

D4.   Nursing homes providing kickbacks to professional guardians for referrals, and receiving kickbacks from providers of medical services or products.

D5. Funeral homes or other service providers providing kickbacks top professional guardians.

# VI. **RELIEF**

Plaintiff Bradley Geller requests this court -

**Enjoin the <u>Michigan Supreme Court</u>, in exercising superintending control, to do all the following -**

A. Take all measures to ensure Michigan probate courts follow **every** provision of state statute and the United States Constitution concerning guardianship, with suspension or removal of judges who remain obstinate.

B. Require all probate court judges to undergo extensive sensitivity training, to include, at a minimum,

- o  Exploration of the judge's attitudes, biases, and stereotypic notions based on labels, age, sex or race, and how these incorrectly inform judicial decisions

- o  Information on differentiating between physical and cognitive disability

- o  Direction on the difference between "informed decisions" and "responsible decisions"

- o  Recognition of the values of independence and dignity

    o   Explanation of sensory deficits and how courts can accommodate individuals

    o   Observation and conversation at nursing homes that provide substandard care

C.   Prohibit individuals or business entities who make contributions to a judicial campaign of a trial judge, or who provide anything of substantial value to or for the benefit of a trial judge, from receiving court appointments as a guardian, conservator, trustee, personal representative, evaluation professional, guardian *ad litem* or counsel (including counsel in civil commitment proceedings).

      The Michigan Supreme Court proposed a court rule addressing "pay to play." The proposed rule was withdrawn in the face of opposition, likely from those who benefit from the present system.

D.  Prohibit any person serving on a county board of commissioners from receiving court appointments of any kind from any court.

E.   Require each probate judge to annually and publically report the number of guardianship, conservatorship, trustee, personal representative, evaluation professional, guardian *ad litem* and counsel appointments (including counsel in civil commitment proceedings) the judge made to each individual and business entity, and the total compensation the individual or business entity received from such appointments.

      The Michigan Supreme Court proposed a rule to establish "government in the sunshine" for court appointments.  The proposed rule was withdrawn in the face of opposition from judges.

F.  Order each probate court to manually count the number of adults with a guardian appointed under the Estates and Individuals Code; the number who have a limited guardian; the number who have a corporate guardian; and the number residing in nursing homes.  Each probate court shall provide the tabulations to the Supreme Court and to the public, under oath by the chief probate judge.

G.  Re-establish the Office of Guardianship Ombudsman

One purpose of the Office is to provide an effective mechanism of review.  Few respondents appeal to the Circuit Court - perhaps due to lack of information about the right to appeal; no right to appointed counsel; insufficient resources (to pay for counsel, a small filing fee, the usual bond of $200 and the transcript); fear of being assessed damages and costs; and a sense the judge will not find fault with a colleague.

The Guardian Ombudsman would have authority to -

- o  Hear, mediate and resolve complaints about court procedures and outcomes, including complaints from individuals under guardianship or conservatorship

- o  Hear, mediate and resolve complaints about the actions or inactions of guardians and conservators.

- o  Alert probate courts about guardians and conservators who are not properly performing their duties.

- o  Suggest to the Supreme Court improvements in court procedures, statutes, court rules and court forms

- o  Refer offending judges to the Supreme Court for appropriate action

H.  Require court staff to screen guardianship petitions before the petitions are filed, weeding out spurious petitions and unnecessary petitions.  One petition noted the need for guardianship by including just one fact, "My husband in grumpy."  Another petition stated, in its entirety, "My mother wears shoes that do not match in color."

I.  Require court staff to review the guardianship file after the guardian *ad litem* submits her or his report.  A pilot program in Washtenaw County revealed the efficacy of screening and preliminary review:

---

**Comparing Washtenaw County Data in Calendar Years 1994 and 2002**

Reduction in the number of adult EPIC guardianship petitions from 120 to 63. (Reduction is particularly evident for older adults.)

Reduction in emergency petitions from 23 to 2

Increase in percentage of petitions withdrawn or denied from 16% to 49%

Increase in percentage of limited guardianships from 11.5% to 67.5%

Reduced reliance on professional guardians from 14 cases to 4 cases

---

J.  Require Constitutionally adequate notice to the respondent of a petition to appoint a guardian, a temporary guardian or a conservator

K.  Require a guardian *ad litem* to explicitly inform a respondent, in language the respondent can understand, of her or his right to attend the hearing and to request a change in the site of the hearing.

L.  Require a court to change the site of a hearing if the respondent wishes to attend but sickness or mobility difficulties preclude the individual from traveling to the courthouse.

M.  Require a Constitutionally adequate, full hearing before issuing an order appointing a guardian, temporary guardian or conservator.

N.  Require the court to allow the respondent to speak at the hearing.

O.  Require trial courts to comply with all requirements of the Americans with Disabilities Act, including accommodations for individuals with sensory deficits, mobility problems and transportation difficulties; and compliance with the doctrine of least restrictive alternative.

P.  If a physician or mental health professional provides written evidence, provide that she or he must use form PC 630, Report of Physician or Mental Health Professional.

Q.  Amend the court form, Order Appointing Guardian of an Incapacitated Individual, to -

   o   Delete checkboxes and require written rendition of the clear and convincing evidence on issues of incapacity and necessity

   o   Require written rendition of the appropriate powers of the guardian

   o   Require the Order to note whether or not the guardian has authority to execute a do-not-resuscitate order pursuant to the Michigan Do-Not-Resuscitate Procedure Act

   o   If the Order grants such authority, the Order and the Letters of Guardianship shall set forth requirements of the Michigan Do-Not-Resuscitate Procedure Act:

40

- o   Attending physician must co-sign the document; guardian must attempt to communicate with the individual before signing the document; guardian must not execute the document if the individual objects; guardian must inform the individual that the individual **always** retains the right to revoke the DNR order executed by the guardian

- o   Require the Order to specify what powers a full or limited guardian has concerning mental health treatment, excluding civil commitment.

- o   Require the Order to specify what powers and under what circumstances a full or limited guardian has authority to withhold or withdraw life-sustaining medical treatment

R.   Amend the court form, <u>Annual Report of Condition of Incapacitated Individual</u>, to -

- o   Delete language implying a guardian has authority to execute a DNR without a physician co-signing the document and without attempting to communicate with the individual before signing

- o   Require the guardian to acknowledge that she or he asked the individual if the individual wishes a change in living situation, a different guardian or to terminate the guardianship

- o   Require the guardian to list the time spent with the individual on each required quarterly visit, and whether there is verification of that visit, such as having signed in at a nursing home

- o   Include an account of expenditures, income and assets to the extent the guardian has control of income (including Social Security and SSI benefits), or both income and assets

41

S.   Amend the court form, <u>Order Appointing Guardian of an Incapacitated Adult</u> to -

- o   Require the guardian to file an Inventory of all assets within the control of the guardian.

- o   Require the guardian to account at least annually for expenditures, income and assets within the control of the guardian, as required by statute and due process

This form accurately reflected the law until the Michigan Supreme Court amended the form recently to contravene the law.

T.   Improve oversight of fiduciaries, e.g., by establishing a mechanism through which probate courts have electronic access to guardians' and conservators' bank sub-accounts. See, e.g., Geller B. "Improving Conservatorship Services in Probate Court."  November 5, 2003.

U.   Through court rule, establish a separate hearing to be held before a guardian is authorized to choose nursing home placement.

A judge must find there is no less restrictive living situation, the particular nursing home meets the individual's medical and social needs and is convenient to the individual's community supports.

The State Long Term Care Ombudsman is an interested person in these hearings.

V.   Requite comprehensive training of all guardians, conservators, guardians *ad litem* and appointed counsel, going far beyond watching a DVD.

See, e.g., Geller, B., <u>Michigan Handbook for Guardians of Adults</u> (13th ed. 2017) http://www.barrycounty.org/Courts%20&%2Law%20Court/Guardians/Guardian_Hand book_2014.pdf (11th ed.)

Geller, B. <u>Michigan Handbook for Conservators of Adults</u> (8th ed., 2012) http://michiganlawcenter.com/pdf/Conservators-Handbook.pdf

Geller, B. <u>Michigan Manual for Guardians Ad Litem and Appointed Counsel in Adult Guardianship and Conservatorship Proceedings</u> (8th ed. 2014) https://nlrc.acl.gov/Legal_Issues/Guardianship/docs/GAL_book-2014.docx

W. Regulate professional guardians, including training, duties, required staffing and "caseloads." See, e.g.. Proposed Michigan Anti-Corruption and Kickback Act, SB 863, 1999-2000 term, as introduced.
.http://www.legislature.mi.gov/documents/1999-2000/billintroduced/Senate/pdf/1999-SIB-0863.pdf

X. Prohibit a court from appointing a court employee as guardian *ad litem* or counsel.

Y. Prohibit any court from appointing as guardian or conservator any person who has received kickbacks, or who has committed Medicaid fraud, embezzlement or any other breach of fiduciary duty.

Z. Prohibit any court from appointing as guardian, conservator, trustee, personal representative, guardian *ad litem* or counsel any person with whom a judge in that county is known to be having a family or intimate relationship.

AA. Prohibit any court from appointing as guardian or conservator any person who has established a pattern of not fulfilling her or his duties, including not visiting; not

43

approving needed and recommended medical care; not obtaining services to bring the individual to the degree of self-care possible; or inappropriately institutionalizing an individual.

BB.   Prohibit the appointment of any county administrator as guardian, conservator, trustee, personal representative, guardian *ad litem* or counsel until the State Attorney General has completed his investigation and rooted out all county administrators who are dishonest or who have not fully performed their duties.

CC. Reassign the cases of individuals who are affected by the preceding three paragraphs, while respecting the statutory preference for family members over professional fiduciaries.

DD.   Require a guardian to file for civil commitment if the guardian wants an individual to undergo inpatient psychiatric treatment or alternative mental health treatment.

### Enjoin the <u>Michigan Attorney General</u> to do all the following -

A.  Require all courts, state agencies and agents of the state to comply with the dictates of <u>Olmstead v. L.C.</u>, 527 US 581 (1999)

B.  Transfer the public administrator system from the Office of Attorney General to the Michigan Supreme Court.  The historical structure of the system stems from probate courts handling escheats.  Since that function has been taken over by the State, the present system is largely an anachronism.

C.  Ensure that each county complies with the statute requiring collection and use of "guardianship due process funds,"  MCL 600.880b, MCL 600.880c.

44

**Enjoin the <u>Michigan Department of Licensing and Regulatory Affairs</u> to -**

A.  Have nursing home surveyors, not nursing home staff, ask each nursing home resident if she or he would like to live in a setting other than the nursing home.

B.  Have surveyors determine which residents are inappropriately in locked units, and order the nursing home to either move such residents or permanently unlock the unit.

C.  Convey a list of the individuals who evince a desire to live in a setting other than the nursing home to the Home and Community Based Care Program at the Michigan Department of Health and Human Services.

D.  Appropriately sanction any nursing home that interferes with the transition of individuals from the nursing home to community based care.

E.  Appropriately sanction any licensed long term care facility that has provided, or is providing, kickbacks to professional guardians for referrals, or is receiving kickbacks from hospice organizations or other providers for products or services.

F.  Appropriately sanction any nursing home that gives a professional guardian access to medical records for any resident for whom the person has not been appointed guardian.

G.   Radically improve training of licensing officers, surveyors, nursing home administrators, directors of nursing and social workers on issues surrounding surrogate decision-making.

**Enjoin the <u>Michigan Department of Health and Human Services</u> to -**

A.  Evaluate all residents who evince a desire to live in a setting other than a nursing home as to whether they financially qualify for the Home and Community Based Care Program or other community based care, and whether the resident could live in the community with adequate supports.

B.  Based on the number of individuals who qualify for the Home and Community Based Program or other community-based care, request a line-item transfer in the Medicaid budget from institutional care to community-based care.

C.  Ensure a professional guardian sets forth, under oath, the activities performed to earn the monthly fee, and access whether the guardian has performed all her or his duties.

D.  Amend the Medicaid State Plan to make explicit that "advocacy services" can mean services aside from guardianship, such as supported decision-making.

Provide relief requested by the United States and further relief this court deems just.

Award Plaintiff or Plaintiffs proper damages, awards and attorney fees, which, in the case of Plaintiff Bradley Geller, will be donated to non-profit entities.

October 3, 2017                                Respectfully submitted,

                                               Bradley Geller

                                               Bradley Geller

JS 44 (Rev. 06/17)

# CIVIL COVER S

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement t
provided by local rules of court. This form, approved by the Judicial Conference of the United S
purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

Case: 2:17-cv-13233
Judge: Lawson, David M.
MJ: Grand, David R.
Filed: 10-03-2017
QUI TAM USA, et al v. SCHUETTE, et al (dw)

## I. (a) PLAINTIFFS

United States
Bradley Geller

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

Washtenaw County

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

County of Residence of First Listed Defendant   Ingham
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

William Schuette
Michigan Attorney General

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☒ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $   0

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   October 3, 2017

SIGNATURE OF ATTORNEY OF RECORD   Bradley Geller

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00      .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc: