

# United States District Court

## Eastern District of Michigan
## Southern Division

---

RONALD E. BOUCHER AND
THOSE SIMILARLY SITUATED,

and

BRADLEY GELLER

**Plaintiffs,**

v.

STATE OF MICHIGAN, though Gretchen Whitmer,
Governor, in her Official Capacity;

DANA NESSEL, Michigan Attorney General,
in her Official Capacity;

BRIDGET M. MCCORMACK, Chief Justice,
Michigan Supreme Court, in her Official Capacity;

ROBERT GORDON, Director, Michigan Department of
Health and Human Services, in his Official Capacity;

ORLEAN HAWKS, Director, Michigan Department of
Regulatory Affairs, in her Official Capacity;

and

Case: 2:17-cv-13233

JUDGE DAVID M. LAWSON

MAG. JUDGE DAVID R. GRAND

ALL MICHIGAN PROBATE COURTS: ALCONA COUNTY PROBATE COURT; ALGER COUNTY PROBATE COURT; ALLEGAN COUNTY PROBATE COURT; ALPENA COUNTY PROBATE COURT; ANTRIM COUNTY PROBATE COURT, ARENAC COUNTY PROBATE COURT; BARAGA COUNTY PROBATE COURT; BARRY COUNTY PROBATE COURT; BAY COUNTY PROBATE COURT; BENZIE COUNTY PROBATE COURT; BERRIEN COUNTY PROBATE COURT; BRANCH COUNTY PROBATE COURT; AND,

CALHOUN COUNTY PROBATE COURT; CASS COUNTY PROBATE COURT; CHARLEVOIX COUNTY PROBATE COURT; CHEBOYGAN COUNTY PROBATE COURT; CHIPPEWA COUNTY PROBATE COURT; CLARE COUNTY PROBATE COURT; CLINTON COUNTY PROBATE COURT; CRAWFORD COUNTY PROBATE COURT; DELTA COUNTY PROBATE COURT; DICKINSON COUNTY PROBATE COURT; EATON COUNTY PROBATE COURT; EMMET COUNTY PROBATE COURT; AND,

GENESEE COUNTY PROBATE COURT; GLADWIN COUNTY PROBATE COURT; GOBEIC COUNTY PROBATE COURT; GRAND TRAVERSE COUNTY PROBATE COURT; GRATIOT COUNTY PROBATE COURT; HILLSDALE COUNTY PROBATE COURT, HOUGHTON COUNTY PROBATE COURT; HURON COUNTY PROBATE COURT: INGHAM COUNTY PROBATE COURT; IONIA COUNTY PROBATE COURT; IOSCO COUNTY PROBATE COURT; IRON COUNTY PROBATE COURT; AND,

ISABELLA COUNTY PROBATE COURT; JACKSON COUNTY PROBATE COURT; KALAMAZOO COUNTY PROBATE COURT; KALKASKA COUNTY PROBATE COURT; KENT COUNTY PROBATE COURT: KEWEENAW COUNTY PROBATE COURT; LAKE COUNTY PROBATE COURT; LAPEER COUNTY PROBATE COURT; LEELANAU COUNTY PROBATE COURT; LENAWEE COUNTY PROBATE COURT; LIVINGSTON COUNTY PROBATE COURT; AND,

2

LUCE COUNTY PROBATE COURT; MACKINAC COUNTY PROBATE COURT; MACOMB COUNTY PROBATE COURT; MANISTEE COUNTY PROBATE COURT; MARQUETTE COUNTY PROBATE COURT; MASON COUNTY PROBATE COURT; MECOSTA COUNTY PROBATE COURT; MENOMINEE COUNTY PROBATE COURT; MIDLAND COUNTY PROBATE COURT; AND,

MISSAUKEE COUNTY PROBATE COURT; MONROE COUNTY PROBATE COURT; MONTCALM COUNTY PROBATE COURT; MONTMORENCY COUNTY PROBATE COURT; MUSKEGON COUNTY PROBATE COURT; NEWAGO COUNTY PROBATE COURT; OAKLAND COUNTY PROBATE COURT: OCEANA COUNTY PROBATE COURT; OGEMA COUNTY PROBATE COURT; ONTONOGAN COUNTY PROBATE COURT; OSCELO COUNTY PROBATE COURT; AND,

OSCODA COUNTY PROBATE COURT; OTSEGO COUNTY PROBATE COURT; OTTAWA COUNTY PROBATE COURT; PRESQUE ISLE PROBATE COURT; ROSCOMMON COUNTY PROBATE COURT; SAGINAW COUNTY PROBATE COURT; ST. CLAIR COUNTY PROBATE COURT; ST. JOSEPH COUNTY PROBATE COURT; SANILAC COUNTY PROBATE COURT; SCHOOLCRAFT COUNTY PROBATE COURT; AND

SHIAWASSEE COUNTY PROBATE COURT; TUSCOLA COUNTY PROBATE COURT; VAN BUREN COUNTY PROBATE COURT; WASHTENAW COUNTY PROBATE COURT; WAYNE COUNTY PROBATE COURT; WEXFORD COUNTY PROBATE COURT, all through their respective chief judges and served through -

**JUDGE MONTE BURMEISTER,** President, Michigan Probate Judges Association; and

**WASHTENAW COUNTY**, Gregory Dill, Administrator of Washtenaw County; and

3

ST. CLAIR COUNTY and ST. CLAIR COUNTY PUBLIC GUARDIAN, Karry A. Hepting, Administrator/Controller, St. Clair County;

and

HEIDI C. AULL, J.D., Public Administrator (Macomb County) and Professional Guardian;

JENNIFER CARNEY, J.D., Public Administrator (Oakland County) and Professional Guardian;

THOMAS B. FRASER, J.D., Public Administrator (Oakland County) and Professional Guardian;

GEORGE HEITMANIS, J.D., Public Administrator (Macomb County) and Professional Guardian;

ALAN A. MAY, J.D., Public Administrator (Wayne County) and Professional Guardian;

JOHN B. MUNGER, J.D.,
Former Public Administrator (Oakland County) and current Professional Guardian

WALTER SAKOWSKI, J.D., Public Administrator (Wayne County) and Professional Guardian

JOHN YUN, J.D.; Public Administrator (Oakland County) and Professional Guardian;

and

ALL OTHER MICHIGAN COUNTIES: ALCONA COUNTY; ALGER COUNTY; ALLEGAN COUNTY; ALPENA COUNTY; ANTRIM COUNTY; ARENAC COUNTY; BARAGA COUNTY; BARRY COUNTY; BAY COUNTY; BENZIE COUNTY; BERRIEN COUNTY; BRANCH COUNTY; CALHOUN COUNTY; CASS COUNTY; CHARLEVOIX COUNTY; CHEBOYGAN COUNTY; CHIPPEWA County; and,

CLARE COUNTY; CLINTON COUNTY; CRAWFORD COUNTY; DELTA COUNTY; DICKINSON COUNTY; EATON COUNTY; EMMET COUNTY; GENESEE COUNTY; GLADWIN COUNTY; GOBEIC COUNTY; GRAND TRAVERSE COUNTY; GRATIOT COUNTY; HILLSDALE COUNTY; HOUGHTON COUNTY; HURON COUNTY; INGHAM COUNTY; IONIA COUNTY; AND

IOSCO COUNTY; IRON COUNTY PROBATE COURT; ISABELLA COUNTY; JACKSON COUNTY; KALAMAZOO COUNTY; KALKASKA COUNTY; KENT COUNTY; KEWEENAW COUNTY; LAKE COUNTY; LAPEER COUNTY; LEELANAU COUNTY; LENAWEE COUNTY; LIVINGSTON COUNTY; LUCE COUNTY; MACKINAC COUNTY; MACOMB COUNTY; MANISTEE COUNTY; AND,

MARQUETTE COUNTY; MASON COUNTY; MECOSTA COUNTY; MENOMINEE COUNTY; MIDLAND COUNTY; MISSAUKEE COUNTY; MONROE COUNTY; MONTCALM COUNTY; MONTMORENCY COUNTY; MUSKEGON COUNTY; NEWAGO COUNTY; OAKLAND COUNTY; OCEANA COUNTY; OGEMA COUNTY; ONTONOGAN COUNTY; OSCELO COUNTY; AND,

OSCODA COUNTY; OTSEGO COUNTY; OTTAWA COUNTY; PRESQUE ISLE COUNTY; ROSCOMMON COUNTY; SAGINAW COUNTY; ST. JOSEPH COUNTY; SANILAC COUNTY; SCHOOLCRAFT COUNTY; SHIAWASSEE COUNTY; TUSCOLA COUNTY; VAN BUREN COUNTY; WAYNE COUNTY; WEXFORD COUNTY, through their respective county executives and served through -

**STEPHEN CURRIE,** Executive Director, Michigan Association of Counties,

**Defendants.**

UNITED STATES, Interested party

**Stephani A. Carter, J.D.** (P-27489) for Defendants
Washtenaw County and Washtenaw County Probate Court
4007 Carpenter Road, #124
Ypsilanti, MI  48197
Telephone: (734) 369-6520
stephaniacarter@att.net

**Patrick Meyers, J.D.** (P-81444) Michigan Assistant
Attorney General, for Defendants State of Michigan,
Michigan Supreme Court, Michigan Attorney General,
Michigan Department of Health and Human Services and
Michigan Department of Licensing and Regulatory Affairs
525 W. Ottawa Street, 5th Floor
Lansing, MI  48909
MeyersP4@michigan.gov

**Theresa M. Asoklis**, J.D. (P-42709) for Defendants
Alan A. May, George Heitmanis, Jennifer Carney,
Jon B. Munger, Walter Sakowski,  Heidi Aull, Thomas
Fraser, John Yun
400 Town Center, 9th Floor
Southfield. MI  48075
Telephone: (248) 355-4141
Theresa.asoklis@ceflawyers.com

**Bradley Geller, J.D**. (P-31441) for Plaintiffs
601 Huronview Blvd, Ann Arbor MI 48103
Telephone:  (734) 665-2330
law_and_aging@yahoo.com

**Peter A. Caplan, J.D**. (P-30643) Assistant United States
Attorney, for Interested Party United States of America
211 Fort Street, Suite 2001
Detroit, MI  48226
Telephone: (313) 226-9784
Peter.caplan@usdoj.gov

# PLAINTIFF'S RESPONSE TO DEFENDANTS MOTIONS TO DISMISS

## STATEMENT OF THE CASE

Plaintiffs allege violations of the rights of Michigan adults who are under court imposed guardianship, bringing claims under the First and Fifth Amendments of the United States Constitution; federal statutes, including the Americans with Disabilities Act; the Michigan constitution and state statutes, and the Nursing Home Reform Act.

Defendants include nine professional guardians, the state's counties and probate courts, the Michigan Supreme Court, Attorney General, Department of Health and Human Services and Department of Licensing and Regulatory Affairs. Six of the Defendants are public administrators chosen by the Attorney General, a seventh is a former public administrator.

Actions of Defendants result in inappropriate guardianships, unnecessary institutionalization and denial of proper medical care and services.

Over the years, the nine professional guardians have been appointed for thousands of adults and currently serve over 2,000 individuals.

7

Studies in contrast: Those under guardianship can languish in less than average nursing homes or unlicensed "board and care" homes, consigned to live out their days somnambulant from over-medication, or bored, wistful for better times. Rooms are too small for more than a stick of their own furniture. Their space shared with a roommate, not a modicum of privacy.

A professional guardian luxuriates on a million dollar estate, the house with five bedrooms and five bathrooms.

Professional guardians enjoy simple pleasures of life: a beautiful sunset up north; the autumnal foliage; tailgate at the UM/MSU gridiron clash; fishing on the lake; attending Opening Day at Tigers Stadium. They engage in the more exotic: an African safari; scuba diving in the Caribbean; whitewater rafting and bicycling in the Rockies; riding the dunes on the Lake Michigan shore; hunting - from bear in Manitoba to sleeping alligators in Florida.

Plaintiffs seek injunctive and declaratory relief, but no damages, against state and all but one local governmental entity named in the Second Amended Complaint.

Plaintiff Ronald E. Boucher seeks compensatory and punitive damages from Defendant St. Clair County and St. Clair County Public Guardianship program, and equitable relief for those individuals similarly situated.

8

Plaintiff Bradley Geller brings a *qui tam* action for Medicaid fraud against seven public administrators and one former public administrator who serve as professional guardians and who receive federal and state funds as guardianship fees under Medicaid.

As is crystal clear from reading the Second Amended Complaint, Plaintiffs do not seek to overturn any state court judgment.

Defendants raise defenses of sovereign immunity, lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted and lack of specificity in the fraud claim. These issues will be addressed seriatim later in this brief.

### INTRODUCTION

"In providing government services, we must recognize the dignity and worth of the individual." Dr. Arthur S. Fleming, former Secretary of the United States Department of Health and Human Services.

Guardianship has an impact upon adults far greater than civil commitment in its breath and often greater than imprisonment in its length.

An individual loses the right to make medical treatment decisions; to control assets and income; and to decide where to live.

A guardian literally has life and death control, with power to sign a Do-Not-Resuscitate Order and a Physician's Order for Scope of Treatment.

An individual can be uprooted from her or his home without explanation (sometimes with police assistance); lose real estate; be denuded of personal property (including a wedding ring); have wishes and values ignored; be subject to inappropriate medication; and be consigned to a locked unit in a substandard nursing home until death.

A system established to protect individuals was first "corrupted" by presumption and paternalism; now corrupted by predation and parasitism.

### EARLY SIGNS OF TROUBLE

Forty years ago, Probate Judge Kip Daley educated Plaintiff on the essence of the Michigan guardianship process:

> Of course a person for whom a guardianship petition is filed needs a guardian. Why else would a petition be brought?
>
> I know what you are going to talk about, counsel: Constitutional rights. They are not important here.

On September 19, 1987, the Associated Press began an investigative series: "Guardians of the Elderly: An Ailing System."

An article made note of serious issues in Michigan, including prominent mention of **ALLAN MAY.**

## MICHIGAN— MISUSED AND POORLY MONITORED
### (By Mark Fritz, Associated Press Writer)

DETROIT— Many of Michigan's elderly people are being stripped of their homes, their incomes and their most basic rights under a misused and poorly monitored  legal process that varies wildly in the state's 83 counties.

While guardianship is intended for people who are physically or mentally incapable of running their own lives, an Associated Press study found that this obscure legal process is being used routinely by:

Hospitals, to discharge elderly people into nursing homes or remove them from life-support systems after their insurance runs out.

Doctors, to protect themselves from malpractice suits.

Nursing homes, to insure bills will be paid.

The Michigan Department of Social Services, which is funneling people to professional guardians it considers undesirable.

As of June, more than 25,000 adults in Michigan were under guardianship, conservatorship or both, according to data collected from Michigan courts.

These guardianship rulings originate in Michigan's 79 probate courts in hearings that often last but a few minutes but usually have lifetime effects.

There is so little monitoring once guardianship or conservatorship is granted, however, that bed-ridden elderly people are increasingly having their assets misused, in some cases plundered, by the very people who were appointed to protect them.

Courts say families of older people are becoming more reluctant to act as guardians. Filling part of the void are growing numbers of professional guardians. Among them are Detroit-area lawyer Alan May, a prominent Republican Party activist who acknowledges he provides no personal attention to his 400 wards, and the Rev. Charles Hilliard, the public guardian in Clare County, a for-profit private guardian in nine other counties and co-owner of a string of nursing homes.

11

Quoted in <u>Abuses in Guardianship for the Elderly and Infirm: A National Disgrace, A Report by the Chairman of the Subcommittee on Health and Long Term Care of the United States House of Representatives Select Committee on Aging</u> (December, 1987).

## LEGISLATION

Two years before the Associated Press report, Michigan had embarked on efforts to overhaul the statutory scheme.

State Representative Perry Bullard, Chair of the House Judiciary Committee, introduced HB 4069 on February 5, 1987. The bill, known as the Michigan Guardianship Reform Act, was enacted as Public Act 398 of 1988. See, Geller, B. "*The Long and Winding Road: Guardianship Reform in Michigan*" 1 Elder Law Journal 177, University of Illinois Law School (1993).

Over the next dozen years, additional bills concerning guardianship and alternatives were passed. See, e.g., Public Act 312 of 1990; Public Act 386 of 1998; Public Acts 56, 312, 313, 463, 464, 465, 456, 457, 468 and 469 of 2000; Public Act 173 of 2012.

The statutes made wide-ranging changes to procedure and substance in guardianship and conservatorship proceedings, including -

12

\*      A guardianship can only be imposed if there is clear and convincing evidence of an individual's inability to make "informed decisions." MCL 700.1105(a). (Prior law had spoken of an inability to make "responsible decisions.")

\*      A guardianship can only be imposed if there is clear and convincing evidence guardianship is necessary to provide for the individual's needs. MCL 5306(1). (Prior law allowed imposition of guardianship if it was "necessary or desirable.")

\*      A guardianship petition must contain specific facts about the person's condition and conduct demonstrating the need for guardianship. MCL 700.5303(1). (No such information was required previously.)

\*      A respondent is entitled to procedural protections, including the right to appointed counsel if she or he wants to contest the petition, object to the person nominated as guardian or requests limits be put on the guardian's powers. MCL 700.5305(3); MCL 700.5305(4). (There was no provision for appointed counsel in prior law.)

\*      Responsibilities of a guardian *ad litem* are spelled out. The appointment of a guardian *ad litem* terminates upon counsel being appointed. MCL 700.5305. (Prior law was silent on these points.)

\*      Even in an emergent situation, the court must give prior notice to the respondent and hold a hearing.  MCL 700.5312(1).  (These requirements were not in prior law.)

\*      If guardianship is appropriate, a judge must first consider a "limited guardianship" wherein a guardian had fewer powers than under a full guardianship.  A guardian can only be granted those powers and for the period of time necessary to meet the needs of the individual.  MCL 700.5306(2); MCL 700.5306(3).  (These requirements were not in prior law.)

\*      Unless a patient advocate (appointed though a durable power of attorney for health care) is not performing her or his duties, a court cannot grant a guardian those powers already held by the patient advocate. MCL 700.5306(2). (This prohibition was not explicit in prior law.)

\*      A court cannot appoint a professional guardian unless the respondent doesn't indicate a choice, there is no family member willing and suitable to serve and appointment would be in the best interest of the respondent. MCL 700.5106(2); MCL 700.5106(2).  (These restrictions were not in prior law.)

\*      A guardian is required to visit the individual at least once every three months, and if meaningful communication is possible, consult with the

14

individual before making major decisions.  MCL 700.5314; MCL 700.5314(a).

(In prior law, there was no requirement a guardian ever meet the individual)

\*       A court must conduct periodic review one year after the initial

guardianship order and every three years thereafter. MCL 700.5309. (There was

no provision in former law.)

Not all legislative efforts were successful.  Bills were introduced to

authorize a family member to make heath care decisions for an individual who

could not make it for her or himself, e.g., HB 5553 (1992).  See, Geller B.

"Medical Treatment Decisions: Back to the Future?" Michigan Bar Journal 72:28

(1993); to ensure certain civil rights were retained by an individual under

guardianship, e.g., HB 5754 (1992); to ban kickbacks to and from professional

guardians, SB 863 (1999).

Unfortunately, the Michigan Probate Judges Association put the kibosh

on later Iterations of the bill to guarantee rights of individuals to freedom of

speech, religion and association. The lead judge expressed fear individuals

would have access to pornography.

Despite these setbacks, Michigan had achieved one the better statutory

schemes among the states. For instance, the State of Florida used the

Guardianship Reform Act as one of two models in revising its laws.

## EDUCATIONAL EFFORTS

Over the years, organizations and agencies such as the Michigan Department of Mental Health, the Family Independence Agency, the Elder Law and Disabilities Rights Section of the State Bar and the Michigan Long Term Care Ombudsman Program have offered educational opportunities through conferences and trainings. These events targeted community mental health staff, adult protective services workers, nursing home professionals, lawyers, legal assistants, judges and advocates.

A long-running, annual conference, *Aging Toward the Future*, drew participation by 300 older adults.

Guardianship was the subject of a pamphlet distributed by Legal Services of Southeastern and a video produced by Irene Kazieczko, who would later oversee all community health centers for the State of Michigan. The Elder Law and Disability Rights Section of the State Bar staged an acclaimed, dramatic reading of the sentencing hearings of the principals of Guardian, Inc. of Wayne County. The performance of Kathy Harris, a leading advocate for reform, indelibly memorable.

Publications were targeted for various audiences, e.g., <u>Michigan Guardianship Reform Act Handbook;</u> <u>Michigan Handbook for Guardians of Adults;</u> <u>Changes and Choices: Surrogate Decision-Making for Health Care in Michigan</u>; and <u>Alternatives to Full Guardianship for Adults.</u>

<u>Changes and Choices</u> was so widely distributed and effective, the Probate and Estates Section of the State Bar and the Michigan Probate Judges Association, in an emulous fit, implored Governor Rick Snyder to fire the author (for putting "the executive branch of government at risk.").

Katy Graham, director of WCNLS Elder Law & Advocacy Center, spearheaded an effort to add additional translations to *"Advance Directives: Planning for Health Care in the Event of Loss of Decision-Making Ability."* The question-and-answer booklet with fill-in-the-blanks and model forms is now available in English, Spanish (translated through the Hispanic Bar Association), Arabic (translated by long term care ombudsman Faiza Najar), Korean, Chinese, Italian, German and Bosnian-Croatian.

## GUARDIAN, INC. OF WAYNE COUNTY

The Guardian Inc. of Wayne County scandal broke almost 25 years ago. Within a few years, probate judges had appointed the firm as guardian for 600

individuals.   John Chase, Jr., in his <u>Report of Receiver</u>, detailed pervasive financial exploitation.

The firm sold a house worth $20,000 - $30,000 for $500 in a straw sale; sold the contents of the house, full of antiques, reporting gross sales as $29; applied for Medicaid when individuals did not qualify; co-mingled individuals' funds with each other and with corporate funds; made pre-paid funeral arrangement for individuals who already had paid for funeral arrangements; and submitted false annual reports and accountings, including hiding fees.

Since Mr. Chase's prodigious task was to "follow the money," he did not explore possible wrongdoing outside the context of financial transactions and did not seek explanation for the explosive growth of the firm. Despite his best efforts, he was unable to trace all the money.

## Jail Time, Fines for Guardian Officials: Company President, Lawyer Stole From Folks in their Care

Detroit *Free Press*, December 6, 1999.

The principals of Guardian, Inc. pled guilty to federal charges and were sentenced to prison.   The United States Attorney at the time, now Michigan Supreme Court Justice, was Stephen Markman.

Regardless of the amount of financial loss, each victim of Guardian, Inc. was awarded $740, some (or all) of which attorneys took as fees.  One or more of those attorneys worked at the firm Kemp Klein with **ALAN MAY**.

### PRESS ACCOUNTS

The threat of prosecution has proven little deterrent to other professional fiduciaries.

A plethora of articles and broadcast segments - more than 60 - have focused on Guardian, Inc. and subsequent alleged wrongdoing by individuals appointed as professional guardians and other fiduciaries by a Michigan probate court.

The most in-depth coverage was a three-part series by Wendy Wendland-Bowyer. The stories kicked off on May 24, 2000 with a front-page, banner headline:

# Who's Watching the Guardians: A Free Press Investigation

19

More recently, Heather Catallo of WXYZ-TV (ABC) reported on public administrators who were fired or resigned under pressure by the Michigan Attorney General.  Allegations against the three focused on the "mishandling" of decedent estates whereby rightful heirs were denied their inheritance, to the benefit of the public administrators and at least one realtor.

**JON MUNGER** was among those discharged.  Another was Cecil St. Pierre, who works in a firm with **HEIDI AULL**.  The third public administrator was Barbara Andruccioli, then an employee of Kemp Klein with **ALAN MAY**.

After being removed as public administrator, Ms. Andruccioli was hired as probate register for Oakland County.  All four Oakland County probate judges approved the hiring, at the highest pay level possible.  One of the judges was Jennifer Callaghan, elected the year before after being an associate of **JOHN YUN**.

The consistency of theme and the geographical breadth of coverage are astounding.  Plaintiffs have a copy of articles should the court wish to review them.

Proposed Discovery #1, for Michigan Attorney General and the United States, through the United States Attorney:

What is the status of any civil or criminal investigation into those activities of Jon Munger, Cecil St. Pierre and Barbara Andruccioli that led to their discharge or pressured retirement as public administrators.

## MICHIGAN SUPREME COURT RESPONSE

**DEFENDANT MICHIGAN SUPREME COURT (MSC)** took a number of steps to address guardianship issues.

* The Elder Law and Disability Rights Section of the State Bar (ELDRS) initiated a successful effort to have the court convene a task force.

* The Chief Justice appointed a Court of Appeals judge as "Guardian Ombudsman," to receive and attempt to resolve complaints about judges and guardians.

* The court proposed a court rule to disconnect court appointments from judicial campaign contributions; another proposed rule would have required judges to publically disclose to whom they gave court appointments (a concept that could be expanded to guardianship proceedings).

\*     Janet K. Welch, soon to be counsel to MSC, initiated a successful legislative effort to have certain probate court filing fees dedicated to the due process costs of guardianship proceedings.

\*     ELDRS approached the court directly. Letter to Chief Justice Elizabeth Weaver, January 10, 2000; letter to Chief Justice Maura Corrigan, January 20, 2003. The Section staged an acclaimed theatrical production of the sentencing hearings of the Guardian, Inc. principals.

### ALAS, EFFORTS WERE FOR NAUGHT

The Michigan Supreme Court ignored unanimous recommendation of the task force (and opted not to publish the four subcommittee reports which most accurately reflected the work of the group). The position of Guardian Ombudsman was short-lived, victim to an internecine battle between successive chief justices. See, Weaver, Elizabeth, and David B. Schock, <u>Judicial Receipt: Tyranny and Unnecessary Secrecy at the Michigan Supreme Court</u> (2013).

Proposed court rules were nixed apparently due to objection from trial judges. Only one or two counties complied with sequestering filing fees for due process costs, which is why **MICHIGAN COUNTIES** are Defendants in this lawsuit.

22

MSC took the bizarre and unprecedented step of ignoring the legislature by changing a court form with a resulting contradiction to the law.    PC 634 Annual Report of Guardian on Condition of Incapacitate Person.

The Michigan Supreme Court, ostrich-like, opts to bury its head in the sand.    (Though the image is picturesque and appropriate, ostriches do not actually bury their heads; they lay their heads on the sand.)

While counsel to the Michigan House Judiciary Committee, Plaintiff requested State Court Administrator Robert Payant, a former probate judge, to disaggregate minor and adult guardianship data.  Plaintiff explained the need to establish a baseline so the effects of statutory changes could be gauged.  Judge Payant's response: a curt,  "No."

On March 1, 1995, William Newhouse, head of probate court services at the Michigan State Court Administrative Office (SCAO), an arm of MSC, sent a memo to staff regarding the nascent Guardian, Inc. of Wayne County scandal:

> Subject:  Channel 7/ Wayne Probate guardianship
>
> Please don't get wrapped up in this through lack of dp [due process] or violation of other statutory mandates, case.  There is a distinct possibility of criminal action and as a result, the [Supreme] court will be laying low on any systemic changes they may be / have been advocating.

The Michigan Supreme Court has known about an untoward relationship between a judge and a guardian. The court twice contracted with the Wahll Group, an organization founded to combat white-collar fraud, to investigate Macomb County Probate Court. Judge Avern Cohen of this court elucidated the situation in Housey v. Macomb County, Case No. 10-11445.

> Tension between Housey and [Judge Kathryn] George began shortly thereafter. The relationship soured permanently when Housey began to question George's appointment of a conservator group called ADDMS.
>
> O'Sullivan enacted a policy in 2005 requiring rotational assignments from an approved list of guardians/conservators. Nevertheless, George appointed conservators from a personal list, which included ADDMS.
>
> Beginning in 2004, Housey sent in excess of twenty (20) reports to the State Court Administrative Office (SCAO) regarding George ....
> Housey reported that ADDMS overbilled estates and mismanaged the affairs of the clients they represented. SCAO did not take any action on Housey's verbal or written reports.
>
> In 2005, SCAO commissioned the Whall Group (Whall) to complete a financial and forensic audit of the probate court's procedures and records. After its investigation, Whall issued a report outlining significant problems. Whall found procedures in conflict with statute; excessive and inaccurate billing of estates; lack of effective oversight of disbursements and conservator accountings; and mismanagement of real estate transactions. Whall made a comprehensive list of recommendations designed to improve procedure and oversight. The report also noted that personal animosity between the judges created a feeling of "awkwardness" in the court. Additionally, the report raised questions of ADDMS's practices as conservator. In response, O'Sullivan stopped assigning ADDMS as conservator to cases on her docket.
>
> George assumed the office of chief judge in January of 2008.
> ...
>
> George issued written memoranda to Housey expressing her disapproval with his practice of whistling in court and forbade bringing donuts for some but not all court employees.

24

...

In January of 2008, SCAO commissioned Whall to complete another audit of the probate court. Whall reported low employee morale, that court procedure was not uniformly applied, and that the personal animosity between George and O'Sullivan rendered the court dysfunctional. Whall found that court employees manipulated the system of random judge assignment to cases. Whall noted that an inordinate number of cases that included a recommendation for ADDMS in the initial petition were sent to George. Whall's report speculated that clerks would set aside a file with an ADDMS recommendation until George's name came up as the assigned judge, thereby subverting the random judge assignment process.

Whall found that sixteen percent (16%) of the audited files contained the appearance of financial mismanagement, up from ten percent (10%) in 2005. Whall found noncompliance with court rules and procedure in seventy-five percent (75%) of audited cases. Additionally, the 2008 Whall report found that a substantial number of cases handled by ADDMS lacked adequate accounting for assets and income.

In May of 2008, George placed Housey on administrative leave pending an investigation of the issues identified by the 2008 Whall report, specifically the manipulation of the random judge assignment system. A *Loudermill* hearing was scheduled and held for Housey.

The Supreme Court reacted to the 2008 Whall report by removing George as chief judge and appointing Kenneth Sanborn (Sanborn). Sanborn served as a Macomb County probate judge and circuit court judge from 1972-1990. The day after his appointment, Sanborn rehired Housey as probate court register. Shortly thereafter, the Macomb County corporation counsel closed the file on disciplinary proceedings initiated by George against Housey.

The Michigan Attorney General conducted an investigation into matters identified by the 2008 Whall report, in particular, the practices of ADDMS. The Attorney General concluded the probate court "is struggling to operate effectively and efficiently under the weight of discord with the court."[8]

....

[8] The findings of this investigation, if any, are not clear from the record. (other footnotes omitted.)

As noted, the Michigan Supreme Court took bold action, taking away the title of "chief judge."   The office of Attorney General apparently swept the dirt under the rug.

———————————

After a performance audit in which several probate courts were chosen as representative of small, medium-sized and large counties, well-regarded Judge John Kirkendall of Washtenaw County explained to Chief Justice Maura Corrigan the need for more staff to adequately oversee conservatorships. Response:  Corrigan forced Judge Kirkendall to ignominiously resign as chief judge, a step to "make me look good" in her aspiration to be elevated to the United States Supreme Court.

The Michigan Supreme Court has known for many years about court veering from the law.  Chief Justice Maura Corrigan requested the State Court Administrative Office to look into this matter, with a focus on Wayne County Probate Court.  SCAO staff did not follow through, fearing reprisal.

As to reach of the court's powers  -

The supreme court has a general superintending control over all inferior courts and tribunals. The supreme court has authority to issue any writs, directives, and mandates that it judges necessary and expedient to effectuate its determinations, and to take any action it deems proper to facilitate the proper administration of justice. MCL 600.219

For unfathomable reasons, the Michigan Supreme Court has chosen not to exert its authority over wayward probate judges. To the contrary, the court has opted to shut its eyes, perhaps relying on plausible deniability.

Upon Plaintiff attempting a survey of divergent practices in probate courts around the state, State Court Administrator John Hohman, Jr., a former probate judge, informed Plaintiff that Chief Justice Robert Young, Jr. was irate and demanding a retraction. Plaintiff compiled the information in a different manner. See, *"In Plain Sight: Variances In Procedure Among Michigan's Probate Courts."*

Unfortunately, there has been neither peer pressure among judges to comply with the law nor but a few judges upon which other judges could model their actions.

Upon complaints filed by aggrieved individuals in guardianship proceedings and press coverage of public administrators allegedly bilking decedent estates, the Honorable Milton Mack, Jr., State Court Administrator and former, long-tine chief judge of Wayne County Probate Court, penned the following letter to the chair of the Oakland County Board of Commissioners:



**Michigan Supreme Court**
State Court Administrative Office
Michigan Hall of Justice
P.O. Box 30048
Lansing, Michigan 48909
517-373-0128

Milton L. Mack, Jr.
State Court Administrator

October 23, 2018

Mr. Michael J. Gingell
Chairman
Oakland County Board of Commissioners
Bldg. 12E
1200 N. Telegraph Rd
Pontiac, MI 48341

Re:     Oakland County Probate Court

Dear Chairman Gingell:

    Your letter to SCAO Region VI Administrator Jennifer Phillips relative to complaints concerning the management of estate and guardianship matters by the Oakland County Probate Court has been referred to me for a response. This office received a series of complaints concerning the Oakland County Probate Court several months ago. We conducted a review at that time to determine whether this office should take any action under MCR 8.113.

    In reviewing the cases, we found no evidence of mismanagement or any failure to follow Michigan's statutes and court rules relative to the handling of estates and guardianship cases by the Oakland County Probate Court. We could find no merit to any of the assertions in the various complaints. Because we could find no evidence that the Oakland County Probate Court was not adhering to ethical and legal standards, I determined that this office would take no further action. Nothing has changed that would cause me to reconsider that decision.

    Thank you for bringing your concerns to my attention. You can be proud of the fact that the Oakland County Probate Court has an excellent reputation. According to our performance measures, the Oakland County Probate Court is a leader in Michigan in the timely resolution of cases.

Sincerely,

Milton L. Mack, Jr.
State Court Administrator

cc:    Kathleen A. Ryan
       Chief Judge, Oakland County Probate Court

Despite a re-written statutory scheme, educational efforts, intense media coverage, prison sentences, advocacy, Supreme Court involvement and other endeavors, the promise of guardianship reform has not been realized. Indeed, the system has worsened, with very few exceptions such as Washtenaw County.

---

**Comparison of Washtenaw County Data in Calendar Years 1994 and 2002**

Reduction in the number of adult EPIC guardianship petitions from 120 to 63. (Reduction is particularly evident for older adults.)

Reduction in emergency petitions from 23 to 2

Increase in percentage of petitions withdrawn or denied from 16% to 49%

Increase in percentage of limited guardianships from 11.5% to 67.5%

Reduced reliance on professional guardians from 14 cases to 4 cases

---

The guardianship process is neither investigative nor adversarial: it is presumptive. Of those guardianship petitions that reach the hearing stage, 98.7% are granted. Calculation based on data in Michigan Supreme Court Annual Caseload Report (2018).

The high "success rate" is reminiscent of the conviction rate in Honolulu's provost courts during martial law of the islands: "Of the more than twenty thousand cases conducted ... in 1942, 98.4 percent resulted in guilty verdicts."

Immewahr, Daniel. <u>How to Hide an Empire</u>. Farrar, Straus and Giroux, New York: 2019.

## DATA

As Sherlock Holmes cogently explained, "It is a capital mistake to theorize before one has data." Doyle, Arthur Conan. <u>A Study in Scarlett. (1887).</u>

---

### Guardianship "Census" as of December 31, 2017

32,475 individuals had a guardian appointed under the Estates and Protected Individual Code

11,623 individuals had a conservator (some of whom also had a guardian)

28,487 individuals had a guardian appointed under the Michigan Mental Health Code as having a developmental disability

Source: State Court Administrative Office. <u>Annual Caseload Report</u>. (2018)

---

If one compares Michigan to its sister state, Ohio, it is twice as likely a Michigan adult will be a respondent in a guardianship proceeding than an adult in Ohio. The comparative decision-making capacity of football coaches aside, there is no acceptable explanation for this disparity.

## **Guardianship Data Comparing Michigan, Wayne County and Ohio CY 2017**

|  | Adult population | Petitions Filed | Open cases (12/31) |
|---|---|---|---|
| Ohio Statewide | 9,058,739 | 6,598 | 47,219 |
| Michigan Statewide | 7,740,716 | 11,943 | 60,962 |
| Wayne County | 1,333,009  (17.2% of MI) | 3,722  (31.2%) | 13,448  (22.1 %) |

Sources: SCAO Annual Caseload Report (2018); U.S. Census estimates, July 2017

Within Michigan, it is 2 1/2 times more likely an adult in Wayne County will be subject to an EPIC guardianship than an adult in the rest of Michigan.

## Guardianship Data Comparing Wayne County with the Balance of Michigan's 83 Counties - CY 2017

|  | Population 65+ | Petitions Filed | Open Cases (12/31/17) |
|---|---|---|---|
| Michigan EPIC Guardianships | 1,663,706 | 8,890 | 32,475 |
| Wayne County EPIC Guardianships | 264,796 (15.9% of MI) | 2,856 (32.1%) | 9,162 (28.2%) |

Sources: SCAO 2018 Annual Caseload Report; US Census July 2017 estimates

Demographic data do not explain this long-standing trend. A prominent judge, Milton Mack, Jr., stated, "We [Wayne County] attract people with problems." However, the number of civil commitments in Wayne County is commensurate with its adult population.

Available data do not allow a comparison of the incidence of guardianship in Detroit with the incidence of guardianship in the rest of Wayne County. Thus,

we have no knowledge whether race and household income are factors in this disparity.

## LEITMOTIFS

Interrelated themes are apparent in Michigan's guardianship system:

\*      Judges don't abide by the law, thereby increasing the number of individuals who have a guardian and increasing the number of individuals with a professional guardian

     \*      Large, professional guardians don't perform their duties

     \*      Financial incentives favor guardianship and institutionalization

     \*      There is vast opportunity for financial exploitation

Judges' behavior might be due to stereotypic notions of older adults and individuals with a disability; a paternalistic value system that exalts "safety" over independence; or for other reasons. A professional guardian just starting out in business explained to Plaintiff:

> My colleagues told me if I wanted court appointments, I would have to buy tickets to the judges' campaign committee fundraisers.

Attorney George Cushingberry, Jr. received lucrative court appointments through Wayne County Probate Court.  Mr. Cushingberry was on the Ways and Means Committee of the Wayne County Board of Commissioners, a committee that set the annual budget of the Wayne County Probate Court.

Judges may don blinders regarding the sequella of guardianship. Judge Milton Mack, testifying before a legislative committee, averred, "Actually, an individual under guardianship has more control over his life than the guardian." A week spent in a locked, dementia unit might give the judges a more acute perception.

Judges can be quite open about not honoring the law.  At a continuing education seminar, Wayne County Probate Judge Freddie Burton, Jr. revealed, "In my 6 1/2 years I have never moved the site of a [guardianship] hearing."

> Michigan statute provides,
>
> The individual alleged to be incapacitated is entitled to be present at the hearing in person, and to see or hear all evidence bearing upon the individual's condition. <u>If the individual wishes to be present at the hearing, all practical steps shall be taken to ensure his or her presence, including, if necessary, moving the hearing site</u>.  MCL 700.5304(4). (emphasis added)

A report by <u>The Court Watch Project: The Monitoring of Guardianship Proceedings in Four Michigan Probate Courts</u>, (2003), an endeavor undertaken

by the Michigan Protection and Advocacy Service and Wayne State University found the respondent in EPIC guardianship proceedings was present at a hearing only 17.8% of the time. The report states -

> [T]he more comprehensive the judge's actions (i.e., asking about the respondent's view on the merits of the case, explaining the basis for his decision) the more likely it was that a decision other than full guardianship was rendered. Finally, the presence of the respondent in court had a powerful effect on guardianship decisions .... [A]decision for full guardianship was significantly less likely when the respondent was present ....

Another judge acknowledged he ignored the law in appointing petitioners as guardians even though the petitioners were already patient advocates. In his words, "if they come to court expecting me to appoint a guardian, I'm not going to disappoint them if I see no harm in it." The motivation behind the enactment of MCL 700.5306(5) had been precisely that judges were ignoring the "necessity" requirement in appointing a patient advocate as guardian.

### JUDGES' DUTY

Whatever the farrago of explanations, judges do not have discretion to ignore procedural or substantive statutory mandates. In a guardianship proceeding, a probate judge's "powers are purely statutory and the requirements

of the statute must be strictly observed." Stevens v. Stevens, 226 Mich. 446, 449; 254 N.W. 162 (1934).

Recently, the Michigan Court of Appeals held,

By using the mandatory term "shall," MCL 700.5106(2) *requires* that, in order to appoint a professional guardian or professional conservator, the probate court must find that the appointment of such a professional is in the incapacitated person's best interests *and* that no other person in priority under the applicable statutes for appointment of guardians and conservators is competent, suitable, and willing to serve in that fiduciary capacity.

In re Gerstler, Michigan Ct. of Appeals. June 5, 2018; published at 324 Mich App 494 (2019). (emphasis in original)

Judges violate statutory mandates and constitutional requirements as they -

\*      Continue to use the pre-1999 standard of an inability to make "responsible" decisions, such that guardianship is imposed when an individual is not "incapacitated." MCL 700.1105(a) and MCL 700.1105(a)

\*      Disregard that an individual has a patient advocate, thereby appointing a guardian when it is not necessary. MCL 500.5306(5)

\*      Forego the required notice and hearing in emergency petitions, or appointing a temporary guardian in non-emergent circumstances. MCL 700.5312(2); the right not to be deprived of liberty

without due process. (Data complied by Oakland County Probate Court apparently indicate hearings are dispensed with as a matter of course.)

* Order a temporary guardianship to last 6 months even though statute limits a temporary guardianship to 28 days. MCL 700.5312(1).

* Undercut the ability of appointed counsel by not discharging the guardian *ad litem* in violation of MCL 700.5305; not appointing a lawyer for an individual who contests the petition violating MCL 700.5305(3); MCL 700.5305(4)); not allowing an individual to hire an attorney in seeking to modify a guardian. MCR 5.408(B)(1).

* Impose guardianship after a 3-minute hearing, with the respondent not present and without clear and convincing evidence presented. MCL 700.5306(1).

* Never limit the powers of a guardian, thus giving some guardians more powers than merited by the demonstrated needs of the individual. MCL 700.5306(2), MCL 700.5306(3) and the limits of *parens patriae.*

* Appoint a professional guardian when there is a family member willing and suitable to serve, or when it is not in the best interest of the

individual, increasing the probability of institutionalization. MCL 700.5106(2); MCL 700.5313;  In re Gerstler, *supra.*

&ast; Fail to require a guardian with control of an individual's income and property to file an annual account, creating the opportunity for financial exploitation. MCL 700.5314(j); the right not to be deprived of property without due process due process.

The dire consequences of a judge's disregard of the law are illustrated by the case, In re Rachel Markle, decided in Ingham County Probate Court by Judge Richard Garcia a decade ago.  Ms. Markle, who indisputably needed neither a guardian (Northwestern University alumna; IQ of 117 recently established;) nor long-term care (according to the nursing home), spent the rest of her life in an institution, merely so her daughter and granddaughter could inherit her home.

The bases for an unsuccessful Motion for Reconsideration in that case: There was no emergency, the court improperly considered "evidence;" a surrogate decision-maker had already been appointed; violation of state statute; improper standard in determining capacity; denial of due process; mediation request denied; right to independent medical exam vitiated.

38

> Proposed Discovery #2, for each Probate Court Judge:
>
> During the period January 1, 2015 to December 31, 2018 -
>
> a)   In how many cases did you appoint a temporary guardian without notice to the respondent?
>
> b)   In how many cases did you appoint a limited guardian?

## PROFESSIONAL GUARDIANS

Although there were a few professional guardians years ago, the proliferation of professional guardians is relatively recent. By requesting probate registers in each county to supply names and contact information, Plaintiff was able to ascertain there were 300 individuals, partnerships and corporations providing these services.

Although defined in statute, MCL 770.1106(u), professional guardians are not licensed or regulated by any state entity. There are no educational or training standards and no explicit staffing requirements.

A probate judge is only permitted to appoint a "professional" guardian if there is no one with a higher priority willing and suitable to serve, and the appointment is in the best interests of the individual.

Judges err in appointing a professional guardian in circumstances explicitly prohibited by statute, with major, deleterious effects on the individual.

**MCL 700.5106 (excerpts)**

(2) The court shall only appoint a professional guardian or professional conservator as authorized under subsection (1) if the court finds on the record all of the following:

(a) The appointment of the professional guardian or professional conservator is in the ward's, developmentally disabled individual's, incapacitated individual's, or protected individual's best interests.

(b) There is no other person that is competent, suitable, and willing to serve in that fiduciary capacity in accordance with section 5212, 5313, or 5409.

(4) ... If a professional guardian or professional conservator appointed or approved under this section receives or is to receive compensation or other benefits as a result of that appointment from a person other than this state, a political subdivision of this state, or a trust created under section 5407(2), the professional guardian or professional conservator shall file with the appointing or approving court a written statement of the compensation or other benefit received or to be received, including the source of the compensation or other benefit, in a form and in a manner prescribed by the Michigan court rules. The professional guardian or professional conservator shall serve a copy of the form described in this subsection to the ward, developmentally disabled individual, incapacitated individual, or protected individual and to interested persons.

(5) A professional guardian appointed under this section shall establish and maintain a schedule of visitation so that an individual associated with the professional guardian who is responsible for the ward's care visits the ward within 3 months after the professional guardian's appointment and not less than once within 3 months after each previous visit.

(6) A professional guardian appointed under this section shall ensure that there are a sufficient number of employees assigned to the care of wards

for the purpose of performing the necessary duties associated with ensuring that proper and appropriate care is provided.

**MCL 700.5313**

(1) The court may appoint a competent person as guardian of a legally incapacitated individual. The court shall not appoint as a guardian an agency, public or private, that financially benefits from directly providing housing, medical, mental health, or social services to the legally incapacitated individual. If the court determines that the ward's property needs protection, the court shall order the guardian to furnish a bond or shall include restrictions in the letters of guardianship as necessary to protect the property.

(2) In appointing a guardian under this section, the court shall appoint a person, if suitable and willing to serve, in the following order of priority:

(a) A person previously appointed, qualified, and serving in good standing as guardian for the legally incapacitated individual in another state.

(b) A person the individual subject to the petition chooses to serve as guardian.

(c) A person nominated as guardian in a durable power of attorney or other writing by the individual subject to the petition.

(d) A person named by the individual as a patient advocate or attorney in fact in a durable power of attorney.

(3) If there is no person chosen, nominated, or named under subsection (2), or if none of the persons listed in subsection (2) are suitable or willing to serve, the court may appoint as a guardian an individual who is related to the individual who is the subject of the petition in the following order of preference:

(a) The legally incapacitated individual's spouse. This subdivision shall be considered to include a person nominated by will or other writing signed by a deceased spouse.

(b) An adult child of the legally incapacitated individual.

(c) A parent of the legally incapacitated individual. This subdivision shall be considered to include a person nominated by will or other writing signed by a deceased parent.

(d) A relative of the legally incapacitated individual with whom the individual has resided for more than 6 months before the filing of the petition.

(e) A person nominated by a person who is caring for the legally incapacitated individual or paying benefits to the legally incapacitated individual.

(4) If none of the persons as designated or listed in subsection (2) or (3) are suitable or willing to serve, the court may appoint any competent person who is suitable and willing to serve, including a professional guardian as provided in section 5106.

Among the larger professional guardians are  "public administrators."

The open cases for five of the Defendants as of March, 2019, are as follows.

|  | Guardian | Guard. and Conserv. | Conservator |
|---|---|---|---|
| JOHN YUN | 418 | 38 | 63 |
| JON MUNGER | 338 | 31 | 80 |
| THOMAS FRASER | 317 | 35 | 68 |
| JENNIFER CARNEY* | 211 | 29 | 29 |
| GEORGE HEITMANIS | 240 | | |

Sources:  Oakland County Probate Court Records, Macomb County Probate Court Records, as of March 5, 2019   * Jennifer Carney total does not include Genesee County appointments

42

> Proposed Discovery #3, for Walter Sakowski, Alan May and St. Clair County Public Guardian:
>
> As of March 1, 2019, for how many individuals do you serve as each of the following: guardian, guardian and conservator and conservator?

## THE PUBLIC ADMINISTRATOR SYSTEM

A system of "public administrators" was created by 70 years ago. Public Act 194 of 1947, MCL 720.201, *et seq.*

Under the law, the State Attorney General has the responsibility to appoint at least one public administrator in each of Michigan's 83 counties, to act only in that county.

The system is currently supervised by long-time Assistant Attorney General, Michael Moody.

The number of public administrators appointed for a county is not directly proportional to its population:

## <u>Public Administrators in Four Largest Counties</u>

| <u>County</u> | <u>Population</u> | Number of Public <u>Administrators</u> |
|---|---|---|
| Kent | 648,594 | 1 |
| Macomb | 871,375 | 14 |
| Oakland | 1,250,836 | 14 |
| Wayne | 1,753,616 | 14 |

Sources United States Bureau of Census; Michigan Department of Management and Budget, Office of State Demographer, updated May 30, 2018; State of Michigan website.

The following list matches each Defendant with the county for whom she or he was appointed:

| | |
|---|---|
| Heidi Aull | Macomb |
| Jennifer Carney | Oakland |
| Thomas Fraser | Oakland |
| George Heitmanis | Macomb |
| Alan May | Wayne |
| Jon Munger | Oakland  (until 2017) |
| Defendant Walter Sakowski | Wayne |
| Defendant John Yun | Oaklan |

44

Since inception, the purpose of public administration has been to address instances when an individual dies with assets subject to probate but leaves no will and has no known heirs. The public administrator is appointed as personal representative to garner assets (often the only asset is a bank account), pay legitimate bills, search for heirs, and forward the balance to heirs, if any. If there are no heirs, the assets escheat to the state. Before funds are forwarded, the public administrator files an account, including attorney fees.

An appointment as a public administrator has been a form of political patronage, a sinecure. The work was simple and very lucrative.

**ALAN MAY** was described as a "prominent Republican Party activist" in the Associated Press series, discussed *supra.* Cecil St. Pierre, who works with **HEIDI AULL**, was president of the Warren City Council and Chair of the 9th District Republicans. Peter Darrow, another longtime public administrator, served as chair of the Washtenaw County Democratic Party.

The system was also a good old boys network. Until 2015, 95% of the public administrators in Wayne, Oakland and Macomb counties were men.

About 20 years ago, the Attorney General took over all escheat cases, undoubtedly because it handle the cases with far less "administrative expense," to wit, high attorney fees for little work.

The statute governing the system is clear: duties of a public administrator are limited to decedent estates, and limited to the county to which they are appointed.

## STATE PUBLIC ADMINISTRATOR ACT (excerpts)

### MCL 720.201. *et seq.*

Sec. 1. There shall be a public administrator for the state of Michigan, to be known in this act as the "state public administrator." The governor shall appoint, upon the recommendation of the attorney general, 1 of the assistants attorney general to act and hold office during the pleasure of the governor as such state public administrator. Such assistant attorney general shall receive no other or further annual salary than that paid to him as an assistant attorney general for services performed while acting as state public administrator. His actual and necessary traveling expenses shall be allowed and paid in the same manner as other accounts of assistants attorney general of like nature are allowed and paid, and the attorney general shall provide him with stationery, supplies and equipment and such legal and clerical assistance as may be required in the maintenance and performance of the duties of his office.

**720.202 County public administrator; appointment, qualifications, and term; source of compensation.**
Sec. 2. **The state public administrator**, when he deems it necessary because of the volume or nature of the duties of his office to engage assistance in the performance thereof, may appoint in any county of this state, as county public administrators, thereof and therefor, any person or persons suitable and competent to administer estates of deceased persons. Each county public administrator shall hold office at the pleasure of the state public administrator and shall be appointed to act as county public administrator only in and of the county in which he maintains his legal residence or principal place of business. A county public administrator shall not receive a salary or other emoluments of office but shall, when appointed fiduciary of an estate by virtue of this act, be allowed all necessary expenses incurred in the administration thereof, together with other fees, compensation, and allowances authorized by statute and by

46

order of the judge of probate to be paid the fiduciary out of the estate, all of which expenses, fees, compensation, and allowances shall be paid out of the corpus of the estate administered. In a county of this state in which there is no person both suitable and willing to act as a county public administrator in and for the county, the state public administrator may appoint the county public administrator of an adjoining county to act in that county.

**720.206 State or county public administrator; powers and authority.**
Sec. 6. The state public administrator and the duly appointed and acting county public administrators shall have all the powers and authority of a fiduciary now or hereafter conferred by law, and shall be subject to the same obligations and liabilities in the administering of estates coming under their control by reason of their appointment as fiduciary under the provisions of this act. It is the intent of this act that all estates coming within the supervision and control of the state public administrator and the control of the duly appointed and acting county public administrators shall be administered in like manner as other estates of decedents are or may be administered, except only as herein provided.

**720.209 State public administrator; vacancy, filling; bond of predecessor fiduciary, continuation.**
Sec. 9. In case of a vacancy occurring in the office of state public administrator from any cause, it shall be the duty of the governor and the attorney general to fill such vacancy forthwith in the manner as in this act provided for appointment of a state public administrator. Upon qualification for such office the succeeding state public administrator shall be the fiduciary of any unclosed estate to which his predecessor was appointed fiduciary under the provisions of this act, and he shall forthwith notify each probate court having jurisdiction of any such unclosed estate of such appointment, and such successor state public administrator shall be entitled to the possession of all the property, bank accounts, books, papers and records pertaining to any such estate, and shall, under the direction of said probate court, proceed to completion of administration of any such estate. The bond of such predecessor fiduciary may be continued as the bond of the new appointee, with the consent of the surety or sureties thereon, but in the event of a new bond being filed, the surety, if a corporation, shall refund the unearned premium on such cancelled bond.

**720.211 County public administrator; termination of appointment; petition to resign trust and for discharge; final accounting.**
Sec. 11. Whenever the appointment of any county public administrator shall terminate, other than by reason of death or incapacity, it shall be within the discretion of the state public administrator either to permit such county public administrator whose appointment has terminated to proceed with the administration of any estate in which he has been appointed fiduciary by virtue of the provisions of this act, or to make written request that such county public administrator present to the probate court, within a reasonable length of time, a petition in manner and form as is in the general probate laws of this state provided, praying that he be permitted to resign his trust, together with his final account, praying also that such final account may be judicially settled and that he be discharged in accordance with the provisions of the general probate laws. The said petition, when made pursuant to the written request of the state public administrator, acting for and in the interests of the people of the state of Michigan, shall constitute sufficient grounds for the entertaining thereof by the judge of probate having jurisdiction of any such estate, and for the granting of the prayer thereof: Provided, That where it appears from such final account that any such estate has been fully administered, upon the allowance thereof by the judge of probate, such fiduciary may be permitted to proceed to close out said estate, to distribute the residue thereof, and to receive his discharge according to law.

**720.212 County public administrator; petition to remove on failure to render final account; proof of mailing; notice of hearing; release of sureties.** Sec. 12. Whenever the state public administrator shall request any county public administrator, whose appointment as such has terminated, to present within a reasonable length of time to the probate court the aforesaid petition, praying that he be permitted to resign his trust, together with his final account as in this act provided, and such former county public administrator has failed, neglected or refused to comply with such request, the attorney general or the state public administrator, may thereupon, on behalf of the people of the state of Michigan, petition the probate court for the removal of such former county public administrator as fiduciary of any estate in which he received such appointment by virtue of the provisions of this act. The said petition of the attorney general or the state public administrator shall have attached thereto a true copy of the aforesaid request, together with proof of mailing thereof to the former county public administrator at his last

known place of business at least 10 days prior to the date of filing of said petition, and such petition shall thereupon constitute sufficient grounds for the granting of the prayer for the removal of said fiduciary and the entry of an order by the judge of probate directing said fiduciary to render his final account: Provided, That notice of hearing on said petition shall be in manner and form as provided in the general probate laws of this state: Provided further, That the sureties of such fiduciary shall not be released from liability until such fiduciary shall have fully settled and adjusted his accounts as by law required.

### 720.213 County public administrator; accounting and petition for compensation; proof of mailing; approval.

Sec. 13. Whenever a county public administrator whose appointment has terminated shall present to the probate court the final account as in this act provided, or whenever any county public administrator shall have rendered any account in any estate in which he has been appointed fiduciary under the provisions of this act, he shall, within 24 hours after same is regularly noticed for hearing, mail to the state public administrator a true copy of such account, together with any petition for extra compensation or allowance filed in conjunction with said account, and file proof of mailing thereof with the probate court. The state public administrator upon receipt thereof shall examine such account and may indicate his approval or disapproval thereof to the probate judge having jurisdiction thereof prior to the date of hearing thereon, and may appear in said probate court to contest any or all parts thereof and the attorney general may appear in like manner for the same purpose, and the said judge of probate shall not pass upon said account in the absence of the aforesaid proof of mailing.

### 720.214 County public administrator; termination of appointment as special administrator; final accounting, filing; general administrator.

Sec. 14. In all estates wherein the county public administrator whose appointment has terminated is acting as special administrator by virtue of the provisions of this act, he shall, upon the request of the state public administrator, forthwith prepare and file final accounts as such special administrator and notice the same on for hearing as provided in the general probate laws of this state, and shall within 24 hours thereafter transmit a true copy thereof to the state public administrator, filing proof of mailing thereof in the probate court. The state public administrator

shall have the same powers and duties in respect to the said accounts of the special administrator as is in this act provided for general administration. In the event that there remains in such estates assets to be administered, the said state public administrator, or any county public administrator specifically designated by him, shall forthwith petition for the appointment of a county public administrator as general administrator of such estates, pursuant to the provisions of this act.

### 720.217 County public administrator; report by fiduciary as to facts causing delay and preventing closing of estate.

Sec. 17. Whenever any county public administrator shall have been appointed fiduciary of any estate by virtue of the provisions of this act, and more than 1 year shall have elapsed since the date of issuance of letters of administration to such fiduciary, and said estate shall not have been closed, the said fiduciary shall in writing inform the state public administrator of the facts and circumstances preventing the closing of such estate.

### 720.218 State or county public administrator; escheated property turned over to state treasurer.

Sec. 18. If the state public administrator or a county public administrator has been appointed fiduciary of an estate under the provisions of this act and has completely administered the estate and if the residue of the estate has been assigned to the people of the state of Michigan as an escheated estate by the judge of probate having jurisdiction of the estate, the fiduciary shall deliver the assigned residue to the state treasurer pursuant to the uniform unclaimed property act, together with a true copy of petition for appointment of administrator and certified copies of final account, order allowing final account, and order assigning residue. In addition to the requirements under the uniform unclaimed property act, the state treasurer, upon receipt of the residue of the estate, shall furnish the fiduciary with official receipts for the residue, in duplicate, 1 to be filed with the probate court having jurisdiction of the estate, the other to be retained by the fiduciary. The fiduciary shall deliver to the state treasurer, together with the residue, any personal effects of the deceased, such as abstracts of title pertaining to real estate that has escheated to the state, unsurrendered insurance policies, receipts, documents, correspondence, or other material having probative value that has come into the possession of the fiduciary and would tend to prove or refute any future claim of ownership in or to the residue. The state treasurer shall

hold the personal effects of the deceased pursuant to the uniform unclaimed property act and make them a part of the records of the estate.

### 720.219 State or county public administrator; interest in estate property prohibited.

Sec. 19. No state public administrator or county public administrator, when appointed fiduciary of any estate by virtue of the provisions of this act, shall directly or indirectly, in any manner whatsoever, acquire any interest in, or bargain for, any property or any benefits incident to such property, which shall or may come into his possession or under his control as such fiduciary, nor shall he acquire any interest in, or bargain public administrator who has been appointed fiduciary thereof by virtue of the provisions of this act. Further, no such fiduciary shall commingle the funds and property of any such estate with his own or with any other property or funds: Provided, however, That such fiduciary may place on deposit in 1 or more bank accounts such funds as come into his possession as such fiduciary but any interest received on such accounts shall be prorated among each such estate contributing to such common bank account and shall not become the personal property of such fiduciary.

### 720.220 State or county public administrator; continuation after discovery of heir; expenses; receipts turned over to state treasurer.

Sec. 20. Whenever the state public administrator or a county public administrator shall be appointed fiduciary of any estate under the provisions of this act, and it shall subsequently appear or be discovered that the deceased left surviving a husband, wife, or next of kin entitled to a distributive share in such estate, and such heir or next of kin shall, under the provisions of the general probate laws of this state, be competent and willing to administer such estate, the state public administrator or such county public administrator shall nevertheless continue as fiduciary of such estate. When such fiduciary shall be the state public administrator, the judge of probate, before making the order assigning the residue in any such estate and wherein the residue is not assigned to the state of Michigan as an escheated estate, shall first allow and order paid to the said state public administrator out of the corpus of said estate, all of the expenses incurred by such fiduciary in administering said estate, together with such other fees, compensation and allowances as are authorized by the general probate laws of this state and by order of such probate judge to be paid to such fiduciary out of such estate. All monies so paid to the

state public administrator shall be forthwith delivered by him to the state treasurer, who in turn, shall place such money to the credit of the general fund of the state.

**720.221 State or county public administrator; access to property, papers and records.**
Sec. 21. The state public administrator, or any person specifically designated by him to act in his behalf, shall at all times have access to and the right to inspect any and all property, books, papers and records, in the possession or under the control of any county public administrator or former county public administrator, pertaining to any and all estates on which letters of administration have been issued to said present or former county public administrator by virtue of the provisions of this act, and may require of any such present or former county public administrator a certified or exemplified copy of any petition, inventory, account, order or pleading, original of which has been filed in the probate court in any estate wherein said present or former county public administrator is or was acting as fiduciary, under the provisions of this act.

---

<u>Proposed Discovery # 4, for  Public Administrators and Jon Munger:</u>

During the time you have been public administrator, for how may decedent estates outside your county of residence or office location have you been appointed personal representative as a public administrator?

---

Disregarding the statutory restrictions, probate judges in Wayne County, followed by judges in Oakland County and Macomb County, began to appoint public administrators to adult guardianship and conservator cases. **ALAN MAY** was the first of the large, public administrators/professional guardians. **JOHN**

**MUNGER** was a long-serving senior partner with Mr. May at the firm, Kemp Klein. **THOMAS FRASER** also formerly worked with Alan May at Kemp Klein. Mr. Munger testified last year he has been appointed guardians in "thousands" of cases.

The many guardianship and conservatorship appointments and the status of the person as a public administrator have always been inextricably entwined, and sometimes impermissibly cross county lines. The following appears on the home page of **JENNIFER CARNEY'S** website:

Jennifer Carney is an Oakland County Public Administrator, appointed by the Michigan Attorney General in 2015. The Oakland and Genesee County Probate Courts have appointed her as a professional fiduciary in over 200 probate court cases. She focuses her practice on service as a guardian, conservator, personal representative, and trustee for adults with developmental disabilities, incapacitated individuals, estates and trusts.

The following is from **DEFENDANT THOMAS BRENNAN FRASER'S** home page:

# Thomas Brennan Fraser Law PLLC.

Oakland County Public Administrator   Phone: 248-619-0001



In some counties, including Oakland County, leading petitioners are adult protective services workers, who nominate a specific professional guardian. Reportedly, **HEIDI AULL** represents **DEFENDANT MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES** in Oakland County proceedings. In some cases, **DEFENDANT ATTORNEY GENERAL** represents Adult Protective Services.

In 2001, the Elder Law and Disability Rights Section of the State Bar informed the Attorney General of its concern about public administrators serving as professional guardians:

55

# ELDER LAW AND ADVOCACY SECTION

STATE BAR OF MICHIGAN

July 11, 2001

PATRICIA K. DUDEK
CHAIR

WILLIAM J. ABU

PRISCILLA CREEVER

CHARLES R. DANNISON

LISA A. DEDDEN

PATRICIA K. DUDEK

BRADLEY H. GEUER

LISA K. GXSLIOTTI

KATHLEEN M. GRAHAM

KATHLEEN N. HARRIS

NORMAN S. HARRISON

THOMAS G. HARTWIG

GARY L. HAYDON

AMANDA L. HOWE

SANFORD J. MALL

KATHERINE A. MARTIN

JUDGE ALLEN J. NELSON

LISA M. PIERCEY

ALAN F. POLLACK

JAMES SCHUSTER

HOLLIS G. TURNHAM

Attorney General Jennifer Granholm
Law Building 7th Floor
Lansing, MI 48909

**RE: Public Administration System**

Dear Attorney General Granholm:

In light of problems that have surfaced over the years, the Elder Law and Advocacy Section requests you take steps to reform the somewhat shadowy system of local public administration.

The system was established to deal with decedent estates and escheats. Escheats are now handled through Lansing and not by county public administrators. Exploring the role of personal representative, news reports from Wayne County and $100,000 fees raise serious questions. There are also instances of public administrators not dealing with issues, such as unclaimed bodies, if no money is involved.

We are very concerned with county public administrators acting as guardians or conservators. First, there is no statutory authority for them to act in these roles. Second, there are individuals who live and work in one county serving as public administrator in another county, in apparent violation of statute. Third, public administrators have no particular training or expertise in serving as guardian. Those appointed for a large number of individuals may appoint a "case manager;" the case manager may in turn hire others. This is not a system of effective fiduciary services, but an opportunity for successive levels to take a cut of the pie.

There is no apparent effort to track the amount public administrators receive in fees, their contributions to judicial candidates, and any connection between the two.

56

## EFFECTS OF APPOINTING A PUBLIC ADMINISTRATOR AS GUARDIAN

The appointment of a public administrator has profound implications for the individual in regard to housing, medical care and services, personal rights and financial affairs and must be viewed in light of the statutory duties of a guardian:

**MCL 700.5314**    If meaningful communication is possible, a legally incapacitated individual's guardian shall <u>consult with the legally incapacitated individual before making a major decision</u> affecting the legally incapacitated individual. To the extent a guardian of a legally incapacitated individual is granted powers by the court under section 5306, the guardian is <u>responsible for the ward's care</u>, custody, and control, but is not liable to third persons because of that responsibility for the ward's acts. In particular and without qualifying the previous sentences, a court order:

(a) The custody of the person of the ward and the power to establish the ward's place of residence in or outside this state. <u>The guardian shall visit the ward within 3 months after the guardian's appointment and not less than once within 3 months after each previous visit.</u> The guardian shall notify the court within 14 days of a change in the ward's place of residence or a change in the guardian's place of residence.

(b) If entitled to custody of the ward, the duty to <u>make provision for the ward's care, comfort, and maintenance</u> and, when appropriate, arrange for the ward's training and education. <u>The guardian shall secure services to restore the ward to the best possible state of mental and physical well-being so that the ward can return to self-management at the earliest possible time</u>. Without regard to custodial rights of the ward's person, the <u>guardian shall take reasonable care of the ward's clothing, furniture, vehicles, and other personal effects</u> and commence a protective proceeding if the ward's other property needs protection. If a guardian commences a protective proceeding because <u>the guardian believes that it is in the ward's best interest to sell or otherwise dispose of the ward's real property</u> or interest in real property, the court may appoint the guardian as special conservator and authorize the special conservator to proceed under section 5423(3). A guardian shall not otherwise sell the ward's real property or interest in real property.

c) The power to give the consent or <u>approval that is necessary to enable the ward to receive medical, mental health, or other professional care</u>, counsel, treatment, or service. However, a guardian does not have and shall not exercise the power to give the consent to or approval for inpatient hospitalization unless the court expressly grants the power in its order. If the ward objects or actively refuses mental health treatment, the guardian or any other interested person must follow the procedures provided in chapter 4 of the mental health code, 1974 PA 258, MCL 330.1400 to 330.1490, to petition the court for an order to provide involuntary mental health treatment. The power of a guardian to execute a do-not-resuscitate order under subdivision (d), execute a nonopioid

directive form under subdivision (f), or execute a physician orders for scope of treatment form under subdivision (g) does not affect or limit the power of a guardian to consent to a physician's order to withhold resuscitative measures in a hospital. As used in this subdivision, "involuntary mental health treatment" means that term as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400.

(d) The power to execute, reaffirm, and revoke a do-not-resuscitate order on behalf of a ward. However, a guardian shall not execute a do-not-resuscitate order unless the guardian does all of the following: (i) Not more than 14 days before executing the do-not-resuscitate order, visits the ward and, if meaningful communication is possible, consults with the ward about executing the do-not-resuscitate order. (ii) Consults directly with the ward's attending physician as to the specific medical indications that warrant the do-not-resuscitate order.

(e) If a guardian executes a do-not-resuscitate order under subdivision (d), not less than annually after the do-not-resuscitate order is first executed, the duty to do all of the following:

(i) Visit the ward and, if meaningful communication is possible, consult with the ward about reaffirming the do-not-resuscitate order. (ii) Consult directly with the ward's attending physician as to specific medical indications that may warrant reaffirming the do-not-resuscitate order.

(f) The power to execute, reaffirm, and revoke a nonopioid directive form on behalf of a ward.

(g) The power to execute, reaffirm, and revoke a physician orders for scope of treatment form on behalf of a ward. However, a guardian shall not execute a physician orders for scope of treatment form unless the guardian does all of the following:

(i) Not more than 14 days before executing the physician orders for scope of treatment form, visits the ward and, if meaningful communication is possible, consults with the ward about executing the physician orders for scope of treatment form.

(ii) Consults directly with the ward's attending physician as to the specific medical indications that warrant the physician orders for scope of treatment form.

(h) If a guardian executes a physician orders for scope of treatment form under subdivision (g), not less than annually after the physician orders for scope of treatment is first executed, the duty to do all of the following:

(i) Visit the ward and, if meaningful communication is possible, consult with the ward about reaffirming the physician orders for scope of treatment form.

(ii) Consult directly with the ward's attending physician as to specific medical indications that may warrant reaffirming the physician orders for scope of treatment form.

(i) If a conservator for the ward's estate is not appointed, the power to do any of the following:

(i) Institute a proceeding to compel a person under a duty to support the ward or to pay money for the ward's welfare to perform that duty.

(ii) <u>Receive money and tangible property deliverable to the ward and apply the money and property for the ward's support, care, and education</u>. The guardian shall not use money from the ward's estate for room and board that the guardian or the guardian's spouse, parent, or child have furnished the ward unless a charge for the service is approved by court order made on notice to at least 1 of the ward's next of kin, if notice is possible. The guardian shall exercise care to conserve any excess for the ward's needs.

(j) <u>The duty to report the condition of the ward AND the ward's estate that is subject to the guardian's possession or control,</u> as required by the court, but not less often than annually. The guardian shall also serve the report required under this subdivision on the ward and interested persons as specified in the Michigan court rules. A report under this subdivision must contain all of the following:

(i) The ward's current mental, physical, and social condition.

(ii) Improvement or deterioration in the ward's mental, physical, and social condition that occurred during the past year.

(iii) The ward's present living arrangement and changes in his or her living arrangement that occurred during the past year.

(iv) Whether the guardian recommends a more suitable living arrangement for the ward.

(v) Medical treatment, including mental health treatment, received by the ward.

(vi) Whether the guardian has executed, reaffirmed, or revoked a do-not-

resuscitate order on behalf of the ward during the past year.

(vii) Whether the guardian has executed, reaffirmed, or revoked a nonopioid directive form on behalf of the ward during the past year.

(viii) Whether the guardian has executed, reaffirmed, or revoked a physician orders for scope of treatment form on behalf of the ward during the past year.

(ix) Services received by the ward.

(x) A list of the guardian's visits with, and activities on behalf of, the ward.

(xi) A recommendation as to the need for continued guardianship.

(k) If a conservator is appointed, the duty to pay to the conservator, for management as provided in this act, the amount of the ward's estate received by the guardian in excess of the amount the guardian expends for the ward's current support, care, and education. The guardian shall account to the conservator for the amount expended.  (emphasis added)

## SPECIFIC BREACHES OF DUTY OF DEFENDANTS

The following pages detail the many ways public administrators have a negative impact upon the quality of life of those individuals for whom they serve as guardian or conservator.

## 1. **Nursing Home Residency**

There is a symbiotic relationship between nursing homes and Defendant Guardians. Professional guardians favor "placing" or keeping individuals in nursing homes and nursing homes have an incentive to fill their beds.

According to the DHHS <u>Nursing Home / HLTCU Bed Inventory</u> published on May 18, 2018, there are 47,425 licensed beds in Michigan; 7,855 of which are considered "excess beds. The occupancy rate in Michigan's nursing homes fell from 88% in 2006, to 82% in 2016, according to the Kaiser Family Foundation.

For fiscal year 2018, the Michigan Medicaid budget for nursing home care was $1,794,419,600.00. PA 2017, No.107, Article X, Part 1, section 122.

Before discussing specific practices of public administrators, it is important to recognize the general effects of nursing home residency.

Fifty years ago a renowned sociologist classified nursing homes along with psychiatric hospitals, as types of "total institutions." He notes an individual comes into the total institution-

> with a conception of himself made possible by certain stable social
> arrangements in his home world. Upon entrance, he is immediately
> stripped of the support provided by these arrangements. ... [H]e begins a

series of abasements, degradations, humiliations, and profanities of self. His self is systematically, if often unintentionally, mortified.

Goffman, Erving. <u>Asylums: Essays on the Social Situation of Mental Patients and Other Inmates</u>. Doubleday & Company, Inc. (1961) p. 14.

Present-day nursing homes and former psychiatric hospitals share other traits: overuse, arguably ineffective or improper treatment and impact on older adults.

When the state legislature appropriated $20,000 in 1878 to purchase land on which to build the Northern Michigan Hospital for the Insane, the rationale was the cool, clean air would have a palliative if not curative effect. Unfortunately, most residents were confined to wards with jail-like bars on the windows. (Ironically, an original building has been converted to high-end condominiums.)

Michigan began to move individual from state-run hospitals in 1962; at that time there were 30,000 residents, 9,000 of whom were older adults. The legislature recognized this inordinate impact on older adults and placed special protections in statutory provisions governing civil commitment proceedings. Today, there are fewer than 800 residents in these hospitals.

For a discussion the misuse of hospitals, see, e.g., Geller J. L. and Maxine Harris. <u>Women of the Asylum: Voices from Behind the Walls</u>. Doubleday. New

York: 1994. The yesteryear of having women in psychiatric hospitals for the "benefit" of their husbands has a parallel today: having older adults (three-quarters of whom are women) in nursing homes for the convenience of their guardians. Dr. Geller, president-elect of the American Psychiatric Association, avers psychiatric hospitalization today is a far less restrictive alternative than nursing home residency.

––––––––––––––––

When Plaintiff inquired of Tammy Dykstra, a professional guardian who operates in several counties in southwestern Michigan, how many of the 37 individuals for who she served as guardian resided in nursing homes, she replied, "I don't know, I'm not into statistics."

Proposed Discovery #5, for each Defendant Guardian:

How many individuals for whom you are currently guardian reside in a nursing home?

**2.   Programs to Divert Individuals from Nursing Homes or To Enable Nursing Home Residents to Move Back to the Community**

Federal policy requires nursing home staff to ask each nursing home resident at admission and periodically thereafter:

> **"Do you want to talk to someone about the possibility of leaving this facility and returning to live and receive services in the community?"**

Section Q of the MDS uses a person-centered approach to ensure that all individuals have the opportunity to learn about home-and community-based services and to receive long term care in the least restrictive setting possible. This is also a civil right for all residents

Inform the resident that answering yes to this item signals the resident's request for more information and will initiate a contact by someone with more information about supports available for living in the community.

If the resident is unable to communicate his or her preference either verbally or   nonverbally, the information can then be obtained from family or a significant other, as designated by the individual. If family or significant others are not available, a guardian or legally authorized representative, if one exists, can provide the information.

Minimum Data Set 3.0 (MDS), Resident Assessment Instrument Assessment   Manual, Chapter 3, Section Q (October 2018)

If a resident indicates an affirmative response to the question, the nursing home has an obligation to contact a "waiver agent" to visit the resident, provide information and evaluate eligibility.  Policy is clear neither nursing home staff

nor a guardian can interfere with this process. **DEFENDANT MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS** is not sufficiently monitoring compliance by nursing homes.

When a waiver agent is contacted, a staff member of the agency will visit the resident, inform her or him of available resources, and conduct an evaluation.

Resources have included Medicaid-funded initiatives such as the Home and Community Base Waiver Program (HCBW) and Adult Home Help (AHH) providing a wide array of services, allowing qualified individuals to move back to the community. The source for the following information is DHHS data.

Over the past 15 years, more than 13,200 nursing home residents have moved from a nursing home to the community with HCBW or AHH benefits.

An additional 2,000 individuals have been able to forestall or prevent a move from home to a nursing home through HCMW, AHH, Money Follows the Person (MFP) or Program of All-Inclusive Care for the Elderly (PACE).

On October 1, 2018, the Home and Community Based Waiver Program (also known as MI-Choice) was replaced by iSPA. The iSPA program offers expanded services and individuals need no longer need meet the "nursing home level of care" to qualify. DHHS projects 5,250 individuals total will be served in the initiative's first two years.

Proposed Discovery # 6, for each Professional Guardian:

During the period January 1, 2016 through December 31, 2018, how many individuals for whom you were or are guardian have moved from a nursing home to a community setting?

## 3. **Choice of Nursing Home**

Federal requirements for a nursing home to participate in Medicare and Medicaid are set forth in 42 CFR part 483 subpart B. Obligations of nursing homes are presented in greater detail in Guidance to Surveyors for Long Term Care Facilities, State Operations Manual Appendix PP (revised, November 28, 2017).

**DEFENDANT PROFESSIONAL GUARDIANS** serve as guardian for individuals who are in "less than average" or "much less than average" homes, as those are rated by the Centers for Medicare and Medicaid Services (CMS), a branch of the Unites States Department of health and Human Services   There is also evidence these Defendants "bunch" individuals in particular homes for the convenience of the guardian, not the welfare of the individuals.

There is co-variance between the incidence of guardianship and the number of individuals receiving psychotropic medication.  Of the 17 nursing homes in Michigan with the highest rate of these medications being prescribed, 9 are located in Wayne County.

## Percentage of Resident Population Receiving Psychotropic Medication

| | | |
|---|---|---|
| Advantage Living Center | Calhoun | 38.10 % |
| Magnum Care of Adrian | Lenawee | 38.64 % |
| Beaconshire | Wayne | 38.89 % |
| Advantage Living Center | Wayne | 39.06 % |
| Boulevard Manor | Wayne | 40.0 % |
| Laurels of Sandy Creek | Allegan | 40.0 % |
| Laurels of Fulton | Gratiot | 40.0 % |
| The Villa at Park | Wayne | 40.5 % |
| Metron of Forest Hills | Kent | 42.0 % |
| St. James | Wayne | 42.63 % |
| Pine Manor | Wayne | 42.86 % |
| Grace of Douglas | Allegan | 43.8 % |
| Metron of Belding | Ionia | 44.23 % |
| Pine River Health Care Center | Gratiot | 45.45 % |

| Alpha Manor | Wayne | 46.9 % |
| Hamilton Nursing Home | Wayne | 50.82 % |
| Law Den | Wayne | 60.92 % |

Source: Center for Medicare and Medicaid Services, United States Department of Health and Human Services, 2nd quarter, 2018

The nursing home with the highest rate in the state, Law Den, is located in Detroit. Physicians had prescribed psychotropic drugs for 60% of its residents. The home, rated by CMS as "much below average," has recently been closed by the state. The final census was 34; of those individuals, 20 were transferred to "below average" nursing homes. **DEFENDANT ALLAN MAY** reportedly had a resident in Law-Den.

------------

Established through the federal Older Americans Act and the Older Michiganians Act, the Long Term Care Ombudsman Program receives funds to work toward improving the quality of care and quality of life of residents in licensed, long-term care facilities. Ombudsman work with residents, families and guardians facilities toward resolving issues and can assist in filing complaints

with the Bureau of Health Systems, **DEFENDANT MICHIGAN LICENSING AND REGULATORY AFFAIRS DEPARTMENT.**

Long Term Care Ombudsman can also work with guardians. But In the eight years Plaintiff served as Assistant State Long Term Ombudsman under the tutelage of SLTO Sarah Slocum, not a single **DEFENDANT GUARDIAN** contacted the program for assistance.

Proposed Discovery #7 for each Defendant Guardian:

How many individuals for whom you are guardian reside in a nursing home that has a rating by the Centers for Medicare and Medicaid Services as -

a) "below average" (two stars)

b) "much below average" (one star)

How may individuals for whom you are guardian reside in one of the 17 nursing homes listed in the above chart?

4. **Transferring Residents**

The effects of involuntary transfer of residents from one nursing facility to another have studied since the 1970's; an early researcher was Leon Pastalan,

Ph.D., of the University of Michigan's Institute of Gerontology.   Negative consequences of moving have been termed "transfer trauma."

Several studies have found an increased rate of morbidity among residents who were moved.  A recent literature review concluded,

> In most studies identified in this review, the health effects of any relocation of older adults suffering from dementia were negative. A decline in physical, mental, behavioral, and functional well-being was reported ...   Ryman, Fred, et al.  "Heath Effects of the Relocation of Patients with Dementia: A Scoping Review to Inform Medical and Legal Decision-Makers." The Gerontologist (2018)

Proposed Discovery #8, for each Professional Guardian:

During the period January 1, 2015 through December 31, 2018, how many residents did you move 2 or more times from one licensed long-term facility to another licensed long term-care facility?

## 5. Unlicensed Congregate Facilities

The State of Michigan licenses three types of long-term care facilities: nursing homes, homes for the aged and adult foster care homes. The extensive requirements for licensure are set forth in statute and administrative rules.

Homes For the Aged: MCL 333.20101, *et seq.*, R 325.1901, *et seq.*

Adult Foster Care Homes:  MCL 400.701, *et seq.*, R 440.1401, *et seq.*   (There are different sets of rules depending on the capacity of the AFC.)

On December 6, 2017, WXYZ-TV reported a story:

## Metro Detroit adults under court guardianship put in unlicensed group home

If these homes provide personal care and supervision they are violating the law by not seeking licensure as an adult foster care home.

As long as a home remains unlicensed, there are no inspections, no periodic visits by licensing officials and no complaint mechanism.  Poor sanitary conditions have been reported in some homes, along with improper diets, inadequate or unlaundered clothing. There is no assurance residents are in compliance with their medication regimens or receive supervision.

On information and belief, at least the following Defendants have individuals in unlicensed homes:   **JOHN YUN, THOMAS FRASER, JENNIFER CARNEY, JON MUNGER AND ALAN MAY.**  Based on change

of address information on court forms, Defendant **JON MUNGER** moves residents often.

Plaintiffs plan to investigate by visiting unlicensed homes in which Defendant guardian have "placed" individuals, in order to document any substandard conditions.

<div style="border:1px solid black; padding:1em;">

Proposed Discovery #8, for each Defendant Guardian:

How many individuals for whom you are currently guardian live in unlicensed congregate facilities?

During the period January 1, 2015 through December 31, 2018, how many residents did you move 2 or more times from one unlicensed facility?

</div>

6. **Sale of the individual's home**

Almost all of us place a supreme value on living at our home. Under Medicaid in Michigan, one's home is an exempt asset for purposes of eligibility.

When an individual is in a nursing home and enrolled in Medicaid, there are certain "costs" that are deducted from the patient pay amount (with Medicaid increasing reimbursement in an equal amount).

One deduction is known as a "home maintenance disregard."   The primary eligibility criterion is that

> a physician certifies that the individual is medically likely to return home from the nursing facility within six months of the date of admission to the facility, if eligible for Medicaid at the time of admission, or within six months of becoming eligible for Medicaid if eligibility is established subsequent to admission.
> Bridges Eligibility Manual (BEM), p.3. (January 1, 2019); Michigan Department of Community Health Program Policy Letter L13-06 (January 29, 2013.)

Eligible expenses include real estate taxes, mortgage or rental payments, all utility costs and homeowner's and renter's insurance.

---

Proposed Discovery #9, for Professional Guardians:

In your years as guardian, for how many individuals have you used the home maintenance disregard?

---

The *modus operandi* for **DEFENDANT JENNIFER CARNEY** and other **GUARDIAN DEFENDANTS** is to sell an individual's home soon after court appointment and denude a home or apartment of a home or apartment of personal possessions.   But in most cases there needn't be a "fire sale," as ownership of the home does not affect Medicaid eligibility.   **DEFENDANT**

**GUARDIANS** have a responsibility to ensure a home is sold for fair market value and is in the best interests of the individual.

Plaintiffs intend to explore evidence of homes being sold for less than the appraised value.   In light of alleged "mismanagement" by three public administrators as personal representatives in decedent estates, it is critical to trace who gets what, when and how from these real estate sales.

If an individual's home is sold or a rental lease terminated, it is obviously impossible for the individual to move back home and makes it more difficult for resident to move back to the community.

There is no doubt a house is the "pearl" when it comes to a guardianship or conservatorship. An individual might have minimal assts and a small income and yet have a valuable piece of property.

Sale of a house is a golden opportunity for **DEFENDANT GUARDIANS** to extract large attorney and fiduciary fees.  The amount of fees need have no relation to the sale price.

Proposed Discovery #10, for Professional Guardians:

For each sale of real property during the period January 1, 2015, through December 31, 2018, in which you participated as guardian, special conservator, conservator or public administrator, please provide case number, buyer, appraised price, selling price and amount of fiduciary fees and attorney fees you received.

During the same period of time, please provide the name and address of every real estate agent you have hired for five or more house sales?

During the same period of time, how many of the homes were "flipped" within 12 months of sale?

## 7. **Accounts and Inventories**

Judges often do not require guardians who handle an individual's income and property to annually account to the court (or to the individual and interested parties). This requirement has been in Michigan law continuously since the year 1837. Guardianship in Michigan has earned the moniker, "a license to steal."

Fiduciaries do not ordinary list non-liquid, personal property on inventories.

A standard inventory for me would just say personal property with a rough estimate of value.

Testimony of **Jon Munger**, In the Matter of Virginia Wahab, Oakland County Probate Court, Case No. 2016-370,475-GA, Petition to Modify Guardianship, Tr. at 94, July 30, 2018.

Mr. Munger's entire testimony is available on videotape for viewing at the Oakland County Courthouse.

Some guardians have a total disregard for the possessions of individuals. In the above-cited case, **JON MUNGER** admits he went into Ms. Wahab's home and took a painting hanging over the mantle, signed by her daughter (a professional artist.   Mr. Munger further testified,   "It's very colorful.   I walk around it every day in my office."   Tr. at 87-89

This court has noted -

Common-law conversion is defined as "any distinct act of domain wrongfully   exerted over another's personal property in denial of or inconsistent with the rights therein." .... Statutory conversion is found at MCL 600.2919a .... [T]he common-law definition defines both common-law and statutory conversion. *Victory Estates, L.L.C. v. NPB Mortgage, L.L.C.*, 2012 WL 6913826, at (Mich. App. 2012) (internal citations omitted).

Kalitta Air  v. GSBD & Associates, et al, Civil Action No. 12-CV-13554 (E.D. Mich 2012)

The actions of Mr. Munger also violate MCL 700.5106(4).

Proposed Discovery #11, for Professional Guardians:

During the period from January 1, 2015, through December 31, 2018, in how many cases did you fail to -

a) list all personal property on an inventory

b) not attach an account of income, expenses and balance of asset value an Annual Report for an individual without a conservator?

Proposed Discovery #12, for Professional Guardians:

During calendar year 2018, what was the total income for all individuals you served as guardian?

As of December 31, 2018, what was the total value of assets for all individuals you served as guardian?

As of December 31, 2018, what the total amount covered by a bond?

## 8. Medical Care

Examples of improper or inadequate medical care by Defendant Guardians; Plaintiffs content many more will be revealed through discovery.

**JOHN YUN, THOMAS FRASER, JENNIFER CARNEY, JON MUNGER, ALAN MAY** and other professional guardians place individuals in unlicensed board and care home in which no one had a duty to ensure proper medical care and their is no regulation of fire safety. (One resident was instructed, in case of fire go out a door or window.)

**DEFENDANT GUARDIANS** do not attend care conferences for nursing home residents.

**ALAN MAY** and other professional guardians have put individuals in nursing homes that provide "much lower than average" care as evaluated by CMS.

**THOMAS FRASER** forced an individual to accept blood transfusions in violation of the individual's religious beliefs as a Jehovah's Witness.

**JON MUNGER** has resident in a facility at which she developed scabies mites.

**JOHN YUN** is guardian for an individual with untreated diabetes.

**DEFENDANT ST. CLAIR PUBLIC GUARDIAN** is unnecessarily institutionalizing Plaintiff Ronald Boucher and others, subjecting them to iatrogenic illness.

**ALAN MAY** had a policy of not approving hospice services for anyone, regardless of the individual's wishes and physician recommendations.

A daughter visited her mother and found her lying in her feces and soaked with urine. Mother was under the guardianship of **THOMAS FRASER**.

**JON MUNGER** testified frequent falls of a client did not make an impression upon him and were not a matter of particular concern as it is not unusual for a 94-year old individual to fall.

**JOHN YUN** is guardian for a resident not receiving a physician-directed special diet. She is offered too little she can eat; mashed potatoes and peas do not a square meal make. John Yun has not applied for nutrition assistance or arranged for Meals on Wheels.

A professional guardian, Dr. Marlena Geha, refused to authorize an ophthalmologist- recommended cataract operation for an individual whose only joys in life  - watching television and playing bingo - were largely foreclosed.

Dr, Geha has been a favorite appointee in Wayne County to conduct evaluations of individuals' need for guardianship, presenting a serious conflict of interest.

## 9. **Other Rights**

**THOMAS FRASER** places a husband in a separate facility from his wife of forty years; Mr. Fraser does not allow the husband to visit his spouse. (Under state and federal law, a nursing home resident has the right to visitors of her or his choice.  Federal regulations also reflect the importance of the marital relationship:  If a wife and husband are in the same facility, they have the right to share a room.)

**JOHN YUN** does not purchase shoes for an individual in need.

**ST. CLAIR COUNTY GUARDIAN** does seek a hardship exception for Mr. Boucher's Supplementary Security Income overpayment, making it more difficult to find housing outside the nursing home.

**JON MUNGER** purloins a painting.

An individual for whom **JOHN YUN** is guardian faces eviction for not keeping her room clean.  Mr. Yun fails to apply for Adult Home Help through which chore services are available.

**JENNIFER CARNEY** rips an individual from his home of 40 years, without considering his eligibility for waiver services and ignoring his long time neighbors eager to continue to assist him.

**THOMAS FRASER** refuses to arrange for a wheelchair ramp for a couple, effectively pinning them in their home without opportunity to enjoy a sunny spring or summer day outside.

**ST. CLAIR COUNTY PUBLIC GUARDIAN** makes no effort to arrange access to public library materials or to a newspaper for Plaintiff Ronald Boucher, a voracious reader who favors the classics.

**JON MUNGER** apparently botches a Medicaid application, putting a resident in jeopardy of involuntary transfer for failing to pay the nursing home bill.

**JOHN YUN** severely limits an individual's interaction with her church community, on the grounds it interferes with her cleaning her room.

10.  **Attorney and Fiduciary Fees**

There are a variety of ways a fiduciary - guardian, conservator, trustee or personal representative - and the lawyers they hire can be paid.

**A.** If an individual is in a nursing home and enrolled in Medicaid, a guardian can take a fee of up to $95.00 per month.  PA 2017, No. 107, Article X, Part 2, section 16.  The guardian subtracts that amount from the individual's patient pay amount and Medicaid increases its reimbursement to the nursing home by an equal amount.

The design of the program unintentionally encourages institutionalization, as the fee is rarely if ever available for individuals in the community.  That is why the **MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES**, which administers the Medicaid program, is a Defendant in this case.

**B.**   Whether or not an individual is enrolled in Medicaid, a guardian or conservator selling the individual's home generates an opportunity for the fiduciary and her or his attorney to change substantial fees.   On information and belief, most if not all of the **DEFENDANT GUARDIANS** are involved in the sale of houses.

84

**C.**   A lawyer drafting a trust and naming herself or himself as trustee, as **JOHN YUN** has done, creating a long-term stream of income.

**D.**   For an individual not enrolled in Medicaid, the amount of fiduciary and attorney fees are whatever the court allows.  Potential ways in which the amount of fees sought can be increased include charging attorney fees for fiduciary tasks; charging attorney fees for work completed by office staff; bloating time records; intra-office conversations; "rounding off" segments of an hour; seeking fees for activities that do not benefit the estate.

**E.**   Some of the above practices are illustrated by the behavior of **THOMAS FRASER**.  Mr. Fraser -

1.   Executes a retainer agreement between himself as conservator and himself as lawyer.  In an abundance of caution, he purportedly has a disinterested person - his wife - witness the document.

For a recent year, in one case he claims about $2,500 in fiduciary fees and $25,000 in attorney fees.

2.   Keeping it in the family, he employs a real estate agent to do an appraisal; the agent's spouse works for Mr. Fraser.  Mr. Fraser hires his father-in-law to clean out the house.

3.  Hires a real estate agent to appraise houses; the agent's spouse works for Mr. Fraser.

4.  Engages lawyers who charge over $200/hr to "supervise" a visit between an individual and family.

5.  Pays a lawyer $38,000 in estate funds to participate in an appeal that could not possibly benefit the individuals under guardianship.

6.  When asked by a reporter to explain his seemingly high fees, Mr. Fraser responds in tautology: "My bills are my bills."

F.  In Senate Bill 209 of 1997, the Probate and Estate Planning Section of the State Bar had drafted, "A person [including a personal representative or attorney] who receives excessive compensation from an estate may be ordered to make an appropriate refund."  Section 3720.  The legislature decided this fell somewhat short of sufficient disincentive for fee gouging.

## MEDICAID FRAUD

1.  A classic case of Medicaid fraud occurs when a physician or other health care provider bills Medicaid for tests and services the provider does not perform.  Conceptually, the activities of **DEFENDANT GUARDIANS** are no

different: All of them accept Medicaid funds for their services, but not one of them satisfies the duties set forth in state statute, and each of them violates federal law.

In addition to examples discussed, *supra*, **ST. CLAIR COUNTY GUARDIAN** has insufficient staff to arrange for Plaintiff Ronald Boucher to move to the community, as reported in a court document.

2.    To be eligible for Medicaid an individual must "spend down" countable assets to $2,000 or less.  By charging unreasonable fees, as discussed above, a fiduciary or attorney enables the individual to receive Medicaid sooner, increasing Medicaid expenditures.

Proposed Discovery #13, for Professional Guardians:

During the period, January 1, 2015, through December 31, 2018, what is the average amount of attorney fees and fiduciary fees you charged the estate between the date you were appointed guardian and/or conservator and the date Medicaid coverage commenced?

3.    For fiscal year 2018, the Michigan Medicaid budget for nursing home care is $1,794,419,600.00.  PA 2017, No.107, Article X, Part 1, section 122.

Given the differential between the costs of institutional care and community-based care (about $70 per day minus patient pay amount), Defendant Guardians decisions to institutionalize (or to keep institutionalized) individuals eligible for waiver programs can cost as much as $25,000/yr. in Medicaid costs.

Nursing homes favor those residents for whom they receive the highest reimbursement: for a short period of rehabilitation after a hospital stay, should an individual need skilled nursing care, Medicare will pay about $550/per day.

Nursing homes are free to set their own rates for private pay residents, rates that will fall between the Medicaid rate and the Medicare rate. Regardless of payment source, there is an understandable (if undesirable) incentive to accept individuals with the lowest care needs.

If a professional guardian receives "compensation or other benefits" from any provider of services - nursing home, hospital funeral home - and does not report it to the court and interested persons, the guardian violates MCL 700.51096(4). Dollars being fungible, to the extent a professional guardian receives a "rebate" for Medicaid-connected services, the guardian also commits Medicaid fraud.

Proposed Discovery #14, for Professional Guardians:

In which five nursing homes are you currently guardian for the most individuals?  In each such nursing home, how many residents do you serve as guardian?
During the period January 1, 2015, through December 31, 2018, how many times has one of those facilities petitioned for guardianship nominating you as guardian?

During that same period, how many times has one of those facilities contacted you suggesting you petition for guardianship for a resident?

Proposed Discovery # 15, for Professional Guardians:

During the period January 1, 2015 through December 1, 2018 -

a)  how many times has an adult services worker employed by the Defendant Michigan Department of Human Services petitioned for guardianship nominating you as guardian?

b)  for how many individuals have you arranged pre-baid funeral and burial services?

4.    If an individual can live in the community with supportive services but a guardian places the individual in a nursing home, or keeps the individual in a nursing home, so the guardian can collect the $95.00 in Medicaid-paid

guardianship fees, the guardian has both committed Medicaid fraud and violated the Americans with Disabilities Act.

**5.** Another important item deducted from a resident's patient pay amount is a "personal needs allowance." This money is to be used by the individual as she or he deems fit, e.g., for clothing, a magazine subscription, a visit to the beauty shop. The personal needs allowance is $37.00/month for an individual on SSI, $60.00 for most other residents and $90.00 for some veterans. 42 CFR 435.725(c)(1); Bridges Eligibility Manual 546, p. 3 (January 1, 2019).

There are professional guardians who have misused this money for "administrative expenses" or otherwise misspent it. To the extend these funds are used for other than their designated purpose, a professional guardian commits Medicaid fraud.

> Proposed Discovery #16, for Professional Guardians:
>
> Do you deposit personal needs funds each month in a trust account with the nursing home? If not, do you account for how personal needs funds for each resident are spent each month?

## "THE NAME OF THE GAME IS MONEY"[1]

Twenty years after the Guardian, Inc. of Wayne County scandal, guardianship can be seen even more clearly as an economic juggernaut, indeed, a $100,000,000 per year cabal.

The independence, dignity, real estate and personal property of many unfortunate individuals are sacrificed, decimated, eviscerated for the financial or other gain of public administrators, bondsmen, assessors, lawyers, guardians, conservators, U-Haul trailer rentals, judges, psychologists, funeral homes, real estate agents, banks, hospitals, nursing homes ....

In this respect, nursing homes echo the prison system, not only in their incarceral environment but the financial incentive to increase the census. Individuals are reduced to pawns, if not chattel.

A recent article in the New York *Times* revealed that not long ago, the California Attorney General submitted a brief in a case involving prison overcrowding. The Attorney General objected to the release of non-violent offenders because the state would have fewer prisoners to conscript to fight wildfires.

---

[1]  Howard Cosell. (J.D., New York University, 1941)

### RESPONSE TO DEFENSES

A.    Sanctions

Moving for sanctions is among the armamentarium of defendants in civil proceedings.    In the present case Defendants' arguments are jejune, or at best unpersuasive.

B.    Failure to State a Claim upon Which Relief Can Be Granted

The individual Defendants assiduously avoid raising a defense to the well-pleaded claims they have no statutory authority to act as guardians and their actions violate, *inter alia*, the American with Disabilities Act.

On the claim of Medicaid fraud, Defendants argue the Complaint does not provide specific enough details for them to prepare a defense.  This is seemingly a Motion for a More Definite Statement.  Regardless, Plaintiffs' Response herein relates more than sufficient information to satisfy the parameters established by the Sixth Circuit:

> In scrutinizing a complaint under Rule 12(b)(6), this Court is required to "accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Dubay v. Wells,* 506 F.3d 422, 426 (6th Cir. 2007). Although a complaint need

not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, <u>127 S.Ct. 1955</u>, 167 L.Ed.2d 929 (2007). Thus, a complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, <u>129 S.Ct. 1937</u>, 1949, 173 L.Ed.2d 868 (2009). And, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.,* <u>579 F.3d 603</u>, 609 (6th Cir.2009) (quoting *Iqbal,* 129 )

<u>Reilly v. Vadlamudi</u>, 680 F.3d 617, 622-23 (6th Cir. 2012).

## C.  <u>Sovereign Immunity</u>

The State, the Supreme Court, the Attorney General and other state departments raise the 11th amendment as a bar to claims against them.

The Second Amended Complaint makes abundantly clear Plaintiffs do not seek any damages against these state defendants.  Plaintiffs seek only equitable relief.

It has been well established for more than a century the 11th Amendment is not a bar to equitable relief.  <u>Ex parte Young</u>, 209 U.S. 123 (1908).  <u>Young</u> is

cited with approval by this court in, <u>LeBlanc v. Michigan</u>, No. 06-CV-13588-DT, 2007 WL 2225860 (E.D Michigan, 2007).

———————————

There is a second indisputable argument why the state defendants are not immune from liability:  Congress has exercised its power to abrogate sovereign immunity in statutes providing for a private right of action.

It is settled law there is a private right of action under Subchapter II of the Americans with Disabilities Act of 1990, as amended.  42 USC sec.12131, *et seq.*

In <u>United States v. Georgia</u>, 546 U.S. 151 (2006) Justice Scalia opined -

In enacting the ADA, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment … ." <u>42 U.S.C. § 12101</u>(b)(4). Moreover, the Act provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." §12202. We have accepted this latter statement as an unequivocal expression of Congress's intent to abrogate state sovereign immunity. See *Board of Trustees of Univ. of Ala.* v. *Garrett*, <u>531 U.S. 356</u>, 363—364 (2001).

The legislative history of Subchapter II of the ADA is, indeed, in accord. See, e.g., Report of the House Committee on Education and Labor, H.R. REP. NO. 485(II), at p. 98 (1990).

Defendants venture that Plaintiffs have not given them fair notice of the claims and their bases. To rebut this we can further explore claims under the Americans with Disabilities Act.

> A regulation promulgated under the ADA requires a "public entity [to] administer … programs … in the most integrated setting appropriate to the needs of qualified individuals with disabilities." <u>28 CFR § 35.130</u>(d).

> Subchapter II of the ADA defines "public entity" to include, *inter alia*,

> (A) and state and local government;

> (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government ....

The State of Michigan, the Michigan Supreme Court, the Michigan Attorney General, the Michigan Department of Health and Human Services, the Michigan Department of Licensing and Regulatory Affairs, probate courts, St. Clair County Public Guardian and counties are all "public entities" for purposes of Title II of the ADA.

By statute, the Michigan Attorney General is responsible for the public administrator system.

The Michigan Department of Health and Human Services sets eligibility standards and regulates operation of the Medicaid program.

The Michigan Department of Licensing and Regulatory Affairs licenses and monitors nursing facilities, adult foster care homes and homes for the aged.

The Michigan Supreme Court directs probate courts through court rules, administrative orders and the power of superintending control: in Michigan, there is but "One Court of Justice."

———————— -

Under the ADA, the term "disability" means, with respect to an individual -

    (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

    (B)  a record of such an impairment; or

    (C)  being regarded as having such an impairment.

    42 USC sec. 12102(2)

An individual who has been deemed an "incapacitated person" under the Estates and Protected Code or has a guardian appointed under the Mental Health Code has, *ipso facto*, a disability for purposes of the ADA.

The U.S. Supreme Court in Olmstead v. L.C., 527 U.S.581 (1999) held that undue institutionalization is a form of discrimination by reason of disability, discrimination prohibited by the federal Americans with Disabilities Act .

Allegations in the Second Amended Complaint identify with specificity actions of Defendants that violate Title II of the ADA, Section 504 of the Rehabilitation Act, the Age Discrimination Act of 1975 and Constitutional rights to equal protection and due process of law.

**D.**     The Rooker-Feldman Doctrine

The Rooker-Feldman doctrine establishes lower federal courts do not have jurisdiction to overturn state court judgments in civil matters.     District of Columbia Court of Appeals v. Feldman, 460 US 462 (1983).  The narrow scope of Rooker-Feldman was delineated in Exxon Mobile Corp. v. Saudi Basic Industries, 544 U.S. 280 (2005).

Defendants' reliance on Rooker-Feldman is misplaced: the doctrine is inapposite here.

Plaintiffs do not request this court overturn a single state court judgment. Indeed, with the exception of a transcript quoted to reveal a prohibited transaction by a guardian, and a reference to the court of Plaintiff's guardianship, not a single probate court case is even mentioned in the Second Amended Complaint.

Defendants' argue that the acts of guardians are "inextricably entwined" with a court judgment and thus covered by Rooker-Feldman. That proposition fails.

The court in <u>McCormick v. Braverman</u>, 451 F.3d 382 (6th Cir. 2006). elucidated the term "inextricably entwined."

> To the extent that Defendants argue that these claims, even though they do not assert injury from the state court judgments, are "inextricably intertwined" with those judgments so as to fall within the reach of *Rooker-Feldman,* that argument must fail. We first note that it was this exact language that was the source of the pre-*Exxon Mobil* woes as to the application of *Rooker-Feldman.* In addition, the Supreme Court used the phrase "inextricably intertwined" in *Feldman*to describe a claim where the plaintiff asserted an injury from the state court judgment itself; the claims of the plaintiffs Feldman and Hickey that the state court judgments were in violation of the Fifth Amendment were inextricably intertwined with the state court judgments, *Feldman,*460 U.S. at 486-87, 103 S.Ct. 1303; and the plaintiff's claim in *Dasher* that the state court judgment was in violation of the Fourteenth Amendment was inextricably intertwined with the state court judgment, *id.* at 483, 103 S.Ct. 1303 n. 16. In *Exxon,* the Supreme Court implicitly repudiated the circuits' post-*Feldman* use of the phrase "inextricably intertwined" to extend *Rooker-Feldman* to situations were the source of the injury was not the state court judgment. In short, the phrase "inextricably intertwined" only describes the conclusion that a claim asserts an injury whose source is the state court judgment, a claim that is thus barred by *Rooker-Feldman. See Davani,* 434 F.3d at 719; *Hoblock,* 422 F.3d at 86-87 ("But the phrase `inextricably intertwined' has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil.*").

<u>McCormick,</u> at 394-395.

Defendants basically argue Booker-Feldman immunizes court-appointed fiduciaries from liability in a federal court proceeding. Again, <u>McCormick</u> lays this argument to rest.

Mr. and Ms. McCormick were divorced couple. Mr. McCormick passed away. Eric Braverman was appointed by the Wayne County Probate Court as successor personal representative for the estate of Mr. McCormick.

Ms. McCormick brought two suits in federal district court; at issue was title to a particular piece of real estate. There were a number of counts in each complaint.

> In Count I, Plaintiff alleges that Defendants Braverman and McCormick seized the Henry Ruff Property under color of state law through "fraud, fabricated unreasonable acts," in violation of the First, Fifth, and Fourteenth Amendment.

The District Court dismissed the suits, finding all claims of Plaintiff barred by the Rooker-Feldman doctrine. The Court of Appeals reversed as to many of the claims:

> The *Rooker-Feldman* doctrine does not preclude subject matter jurisdiction in this case of Counts I through V. in Case No. 04-70613 and Count III in Case No. 04-70622. In these counts, Plaintiff does not complain of "injuries caused by the state court judgments," *id.* at 1521-22; she does not claim that the state court judgments, with respect to Mary's divorce and to the order of receivership, in and of themselves violate the federal Constitution or federal law, unlike the plaintiffs in *Rooker* and statute is unconstitutionally vague and overbroad. In Count I of Case No.

99

04- 70613, Plaintiff claims that Defendants Braverman and McCormick committed fraud and misrepresentation in the divorce proceedings between Mary and Edward's estate. In Count II, Plaintiff claims that Defendants Braverman and McCormick intentionally did not make Plaintiff a party to the litigation concerning the order of receivership, so that she did not have an opportunity to assert her property right over the Henry Ruff Property. In Count III, Plaintiff repeats her claim that Defendants Braverman and McCormick committed fraud and misrepresentation in the divorce proceedings between Mary and Edward's estate. In Count IV, Plaintiff claims that Defendants Braverman and McCormick committed an abuse of process in the divorce proceedings between Mary and Edward's estate. In Count V, Plaintiff claims that MCL § 700.1303 is unconstitutionally vague and overbroad. In Count III of Case No. 04-70622, Plaintiff claims that the order of receivership was obtained through fraud and misrepresentation, though she does not specify who committed these actions.

None of these claims assert an injury caused by the state court judgments; Plaintiff does not claim that the state court judgments themselves are unconstitutional or in violation of federal law. Instead, Plaintiff asserts *independent claims* that those state court judgments were procured by certain Defendants through fraud, misrepresentation, or other improper means. (citation omitted; emphasis in original)

McCormick, at 392.

Mr. Braverman was a court-appointed fiduciary. Defendant guardians are court-appointed fiduciaries. Ms. McCormick's claims, including fraud, sounded in tort. Plaintiffs' claims here, including civil rights violations and fraud, sound in tort.

McCormick controls. The Rocker-Feldman doctrine is not a bar to claims of Plaintiffs against Defendant guardians in this lawsuit.

E.  Standing